[No. 15776.   Department Two.   October 4, 1920.]

FRANK MORTON *et al., Appellants,* v. WALKER D. HINES,
*as Director General of Railroads, Respondent.*

E. J. SCHANK *et al., Appellants,* v. WALKER D. HINES,
*as Director General of Railroads, Respondent.*[1]

WATERS (55, 56)—OBSTRUCTIONS—SURFACE WATERS—FLOODS—EVI-
DENCE OF DEFLECTION—SUFFICIENCY.  A bridge pier is not shown to
have been the cause of overflowing the left bank of the stream in
the time of an unusual freshet, where the angle of the pier was ·
shown to have a tendency to deflect the water to the other bank, the
river turned sharply to the right below the bridge, naturally tend-
ing to deflect the current to the left bank, and the freshet was the
highest known in sixteen years, and inundated both banks for great
distances both above and below the bridge.

WATERS (55)—SURFACE WATERS—LIABILITY.  Waters escaping
from the banks of a river at times of flood are surface waters which
an owner may lawfully protect against by embankments, even though
the effect is to cast the increased flow upon other lands.

Appeal from a judgment of the superior court for
Lewis county, Reynolds, J., entered September 26,
1919, upon granting a nonsuit, dismissing consolidated
actions for damages for overflowing lands, tried to the
court and a jury.   Affirmed.

*C. D. Cunningham* and *Forney & Ponder,* for appel-
lants.

*Bogle, Merritt & Bogle,* for respondent.

FULLERTON, J.—The appellants Morton and wife and
the appellants Schank and wife brought separate ac-
tions against the respondent, Walker D. Hines, as di-
rector general of railroads, to recover in damages for
injuries to their real property, alleged to have been
caused by the wrongful acts of the respondent while
in the maintenance and operation of the railroad of

¹Reported in 192 Pac. 1016.

the Oregon-Washington Railroad & Navigation Company, of which he was then director. After issue had been joined on the complaints, the causes were consolidated for trial, and a trial entered upon before the court sitting with a jury. At the conclusion of the evidence on behalf of the appellants, a challenge to the sufficiency of the evidence was interposed by the respondent, which the court sustained, entering a judgment of dismissal in each of the actions. Appeals were separately taken, but were consolidated in this court for hearing, and we will notice them as a single proceeding.

The appellants' properties are situated in the town of Galvin, in Lewis county. The line of railroad of the railroad company named, as it approaches the town from the east, runs in a northwesterly direction, and crosses the Chehalis river about one-fourth of a mile before it reaches the town. The Chehalis river is a considerable stream. The railroad crosses it on a bridge, some two hundred and eighty-six feet long, which rests on three piers, one on the west bank of the river, one near its center, and one near the eastern bank. It crosses diagonally, deflecting from a right angle between twenty and thirty degrees, the western end of the bridge being lower down the stream than the eastern end. The pier in the center is at right angles to the course of the bridge, and consequently sets diagonally with the course of the stream. The railroad and bridge were constructed in the year 1910. As originally constructed, the railroad track between the river and the town of Galvin ran over a trestle built upon piling driven in the ground and was between eight and ten feet high. On the left side of this trestle were private homes, a dismantled sawmill, and cultivated lands. Opposite were other cultivated lands.

No water course extended over this land, although there were in two place depressions in the surface which might have been eroded by running water at some former period. The slope of the land is downward from the river until it reaches the limits of the town of Galvin, at which point there is a ridge on which the major part of the town is built. The place at which the railroad intersects the boundaries of the town is some ten feet lower than the elevation at the bridge. The respondent's properties were practically at this lower level, although protected from the river by a ridge some two feet higher than the surrounding levels. In 1918, the respondent caused the trestle to be filled with earth, gravel and rock between the river and the town of Galvin, making a solid roadbed for the entire distance, save for two openings left at the depressions mentioned, sixteen feet in width.

The Chehalis river, for some distance above and for a short distance below the railroad bridge, makes a somewhat gradual curve to the right or east. From the latter point it curves sharply still further towards the east, continuing its course for a distance of perhaps a quarter of a mile, where it turns in a half circle to the west, flowing in the opposite direction from, and almost parallel with, the last course mentioned. It continues on this course for some distance, then curves to the south, where it is met by a creek called Lincoln creek, when it turns and flows in a course slightly west of north. The distance from the bridge to the mouth of Lincoln creek, following the course of the river, is two and one-eighth miles. In a direct line the distance is three-fourths of a mile.

In January, 1919, a freshet occurred in the Chehalis river. It overflowed its banks on both sides for a considerable distance both above and below the railroad

bridge, flooding the adjoining and adjacent territory. It was these flood waters that injured the appellants' property, and it is to recover for this injury that the present actions are prosecuted. The grievances and contentions of the appellants' are clearly stated by their counsel in the following language:

"In order to make our position plain at the outset we will say, in an epitomized form, that our grievance against the defendant, based upon the evidence, is that he did, by means of a bridge pier, turn the waters of the river out of the channel, which he had no lawful right to do; that these same waters, after he had turned them from the stream, he continued to control, and collected into a mass by means of his railroad embankment, and cast them into a torrential body upon the lands of plaintiffs, to their damage. As to this latter act we shall contend that defendant had no right in law, to direct against plaintiffs, artificially and en masse, the water which he had himself, by his own unlawful acts, forced out of a natural water course, because it is not what the law regards as surface water, at least the law will not permit him to treat it as surface water, but it continues to be and remains the water of a stream, diverted from its natural and accustomed course, and compelled to seek a new channel across plaintiffs' land. And we shall go even further and meet counsel on his own chosen ground, and show that, even if counsel can construe this artificially diverted flood to be surface water, yet defendant had no lawful right to treat it as he did, by casting it in a body and in an unusual manner upon plaintiffs."

The bridge pier referred to by counsel is the pier set in the center of the stream under the railroad bridge mentioned. But that this caused the overflow, or aided in any manner in causing it, we can find no evidence in the record to support. The pier was wedge shaped at its upper end, and certain of the witnesses testified that the current of the river, on striking the west face of the wedge, was deflected off to-

wards the west bank. But, as we have shown, the pier. was set diagonally with the current, the upper end of the pier farther west than the lower end, and clearly, for physical reasons, the greater tendency of the pier was to deflect the water towards the other side of the stream. It was testified, also, that the current of the river approached the left bank some five hundred feet below the bridge. But here again the fact is sufficiently accounted for by natural causes. Flowing water, like any other moving, inanimate substance, moves in a straight line until interfered with by some counteracting force. At the point mentioned, the river turns sharply to the right, and the tendency of the current would for this reason, regardless of interferences five hundred feet above it, crowd against the river's left bank.

But there is another all sufficient reason for saying that the bridge pier was not the cause of the overflow. This freshet was the greatest known on the river for at least sixteen years, if not the greatest known in local history. It covered a great area of land lying to the right of the river, all of the area lying to the left of the river within the bend described, save two small areas, in one of which the town of Galvin was in part located, and another a short distance from the town towards the northeast, and a great area lying to the southwest of the fill. The water formed a vast lake. It overflowed the banks of the river for great distances, both above and below the railroad bridge. Under these conditions, it is idle to say that the bridge pier had aught to do with the cause of the inundation.

But there was evidence tending to show that the usual course of the current of the water escaping from the river immediately below the railroad bridge was over the lowlands between the bridge and the town of

Galvin, from whence it flowed around the highlands
on which the town was situated, returning to the river
by way of Lincoln creek, and that filling the trestle
with a solid embankment dammed this current, causing
it to take another course to the creek, which course it
found over the appellants' lands. While the appellants
seemingly so contend, the evidence does not justify the
conclusion that their properties would not have been
inundated had the embankment not existed. The most
that can be claimed is that the direction of the current
of the water was changed by the embankment, and that
this current caused the land to wash, which it would
not have done had the water been free to follow the
natural slope of the ground.

But we cannot follow the appellants' counsel in their
contention that this fact, assuming it to be established
by the evidence, vests in the appellants a right of re-
covery. This court has adopted the outlaw doctrine
as to surface waters. *Cass v. Dicks,* 14 Wash. 75, 44
Pac. 113, 53 Am. St. 859; *Harvey v. Northern Pac. R.
Co.,* 63 Wash. 669, 116 Pac. 464; *Wood v. Tacoma,* 66
Wash. 266, 119 Pac. 859; *Miller v. Eastern R. & L. Co.,*
84 Wash. 31, 146 Pac. 171. Waters escaping from the
banks of a river at times of flood are surface waters,
and are waters which an owner of land may lawfully
protect against by dikes and fills on his own property,
even though the effect is to cause an increased flow of
water on the lands of another to the damage of his
lands. *Harvey v. Northern Pac. R. Co., supra,* is
similar in its facts to the situation here. There the
railway company had made a similar fill to the one now
in question, which had the effect of preventing overflow
water from the Snohomish river from spreading over
a low bottom as it had been wont to do prior to the
making of the fill, and causing it to flow in an increased

volume along the fill and discharge upon the complainants' property. We held there could be no recovery, using this language:

"Appellant further contends that, even though the water causing this damage be held surface water, the respondent is nevertheless liable for such damage, because it has collected and diverted such water from its usual course, and discharged it upon appellant's land in a quantity greater than, and in a manner different from, its natural flow. This contention cannot be sustained. Respondent has not collected the water on its right of way and thereafter discharged it upon appellant's premises. It was entitled to protect itself against the water escaping from the banks of the river, and could only do so by some method which would prevent it from flowing upon and over its lands, and this it did. When prevented from flowing upon respondent's land by the embankment, the water necessarily continued its flow along the general course of the river until it reached a point where, for want of obstruction, it was discharged upon appellant's land. Respondent has done nothing further than to exercise its common law right of protection against surface water. It is to be presumed that appellant may do the same. The allegations of his amended complaint do not show that he has done so, and any injury he may have suffered is regarded under the law of this state as damnum absque injuria."

The appellants cite the cases of *Peters v. Lewis,* 28 Wash. 366, 68 Pac. 869; *Noyes v. Cosselman,* 29 Wash. 635, 70 Pac. 61, 92 Am. St. 937; *Sullivan v. Johnson,* 30 Wash. 72, 70 Pac. 246, and *Holloway v. Geck,* 92 Wash. 153, 158 Pac. 989, as authoritative on the question here involved. In these cases the owners of property sought to rid their lands of surface and percolating waters, and more or less permanent water beds, which were wont by nature to collect or rest thereon, by confining the water to artificial channels and casting it in

a body on the lands of the adjoining proprietors. In the present case, and in the several cases we have cited as analogous in principle, the proprietors were but fencing their own lands against the encroachment of surface water arising from sources apart and away therefrom. Owing to these differences in the facts, this court has applied to them different principles of law, holding in the one class of cases that the acts were wrongful and subject to restraint by the courts, and in the other that the land proprietors acted within their just rights. It may be, as the appellants' learned counsel very forcibly argue, that it is hard to justify these differences by any well defined legal principles, but it is a difference, nevertheless, which this court has made from the earliest times and has become a settled rule of property. More harm would follow a departure from the rules than from an adherence to them.

The judgment is affirmed.

HOLCOMB, C. J., MOUNT, BRIDGES, and TOLMAN, JJ., concur.