[No. 30093.  *En Banc.*  August 28, 1947.]

FELIX DeRUWE et al., *Appellants*, v. MILLAR A. MORRISON
*et al.*, *Respondents.*[1]

[1]Reported in 184 P. (2d) 273.

*George W. Young* and *Powell & Nethercutt,* for appellants.

*Tustin, Chandler & Tustin,* for respondents.

HILL, J.—Appellants seek to compel the removal of a dam erected by respondents on their own property, which dam, appellants contend, obstructs a natural watercourse and floods their land at certain seasons of the year. The land in question is part of the Saltese basin, or the bed of what was formerly Saltese lake.

Saltese lake, when meandered in 1878, was a large but shallow body of water shaped somewhat like a potato, located on a bench in the Spokane valley. It was approximately two and one-half miles in length between the extreme northerly and southerly points and about a mile across at its widest point. Its greatest depth was seven feet, in the northeasterly portion, but for the most part it was much less than that; the contour map in evidence would indicate that, for most of the area originally covered by the lake, the depth was from two to four feet. Aside from certain potholes, or depressions, the lake basin is almost level, but the downward slope, such as it is, runs from south to north. However, there is a low spot on appellants' property to the south where water accumulates before it reaches respondents' land, which lies to the north. The

outlet in the northwest corner of the lake was referred to in the notes of the original survey, made in 1878, as being fifteen links, or about ten feet, in width. The deepening of this outlet has been the principal factor in drawing the water off the lake bed.

The status of the bed of the lake and the rights of various parties therein have been the cause of extensive litigation, much of which has found its way to this court. See *Morrison v. Bernot,* 58 Wash. 302, 108 Pac. 772; *Gauthier v. Morrison,* 62 Wash. 572, 114 Pac. 501, reversed in 232 U. S. 452, 58 L. Ed. 680, 34 S. Ct. 384; *Bernot v. Morrison,* 81 Wash. 538, 143 Pac. 104, Ann. Cas. 1916D, 290; *Denee v. Morrison,* 95 Wash. 76, 163 Pac. 382; and *State ex rel. Wirt v. Superior Court,* 10 Wn. (2d) 362, 116 P. (2d) 752. One of the points determined was that the owner of the littoral lands owned the bed of the lake to the center thereof. We quote a sentence from *Denee v. Morrison, supra:*

"We must assume, therefore, that these lands were, at the time of the survey, the bed of a nonnavigable lake, and, being so, under the case of *Bernot v. Morrison, supra,* where the authorities from both this court and the supreme court of the United States are collected and considered, we concluded that the bed of this lake was not the property of the state, nor the property of the United States, but was the property of the littoral owners who had reclaimed the lands from the lake."

The principal figure in the work of reclaiming this land from the lake was Peter Morrison, now deceased. The respondents, who are the successors in interest of Peter Morrison, own about three fourths of the lake bed. The remaining one fourth, at the south end of the lake, is owned in part by the appellants and in part by Mrs. Anna Helm. Peter Morrison acquired title to the property now owned by the respondents in 1892.

On the Morrison property, an extensive system of drainage ditches has been established and maintained at considerable cost, including ditches along both the east and west sides of the lake bed and a ditch called the main ditch, which is the dividing line between the holdings of re-

spondents Millar A. Morrison and Harry A. Morrison. What would be called the intake, or the beginning of this ditch, is about sixty feet north of a point called Four Corners, on the south line of the land owned by respondents. This is the common corner of the holdings of respondents Millar A. Morrison and Harry A. Morrison, and also of those of the appellants and Mrs. Helm. (The south line of respondents' property and the north line of the properties of the appellants and of Mrs. Helm is the east and west center line of section 33, township 25 north, range 45 east of Willamette meridian, which section will hereafter be referred to as section 33.) This (the main) ditch runs about one and three-eighths miles in a northwesterly direction and then goes, mostly west but a little north, about five eighths of a mile to the outlet. The intake, or beginning, of this ditch is on ground which is a little higher than the surrounding lake bed. The trial judge, who viewed the premises, inquired as to whether this was a natural or a man-made elevation, to which Harry Morrison replied: "It has been there since I can remember back. There has never been any dirt hauled in to raise it."

It is a dam installed at this intake of which the appellants complain. The dam is made up of sacks of dirt piled on top of each other, and serves the purpose of keeping water from the south out of the main ditch. It extends ten or twelve inches above the top of the ditch, and, consequently, above the surface of the lake bed.

It is the theory of the appellants that Saltese lake originally was a natural watercourse and that the waters from Quinimosa and Mouser creeks, which flowed into the lake at points south of the dam in question, made their way through the lake and eventually through the outlet located at the northwesterly end thereof.

Whether they rely on the theory that the entire lake bed remained a natural watercourse, or on the theory that the main ditch had been substituted therefor and has become, in effect, a natural watercourse, is not clear, and we shall therefore deal with both theories.

We shall proceed first to a determination of the question of whether the main ditch has been substituted as a natural watercourse.

It is urged by the appellants that certain pleadings and the findings, conclusion, and judgment in the case of *Denee v. Morrison, supra,* together with an affidavit of Peter Morrison which is part of the record in that case, should have been admitted in evidence. We will not pass upon that question, but, since they are before this court, we will assume that they should have been admitted and will consider them with the other evidence in the case. The affidavit, dated July 15, 1914, reads in part as follows:

"Affiant further says that he first saw Saltese Lake in the year 1889 . . . and in the said year 1889 the said lake consisted of a large body of water with patches of tules and rushes therein. . . . that in the month of April, 1892, affiant examined said lake and the land around the same, and . . . there was still an unbroken body of water within said meander line with patches of tules and rushes therein; that at that time, to-wit, April, 1892, there was running from said lake a large ditch of probably a mile and a half long draining the same; that by reason of said ditch and a great enlargement thereafter made by affiant and others for the purpose of draining said lake, the said lake is now practically drained, though a large part of the bed thereof is still subject to overflow in the high water season. . . .

"*Affiant further says that said lake was further fed or supplied by two mountain streams or creeks emptying into the same, and that said streams or creeks flowed the year around, and still continue to flow through the bed of said lake in a ditch,* except that the flow is now interrupted by the diversion therefrom of the waters of said streams for the purposes of irrigation, and it is also fed by several other streams dry for a short period during the summer time.

"Affiant further says that . . . affiant and other abutting owners have since 1892 continuously prosecuted their efforts to drain said lake." (Italics ours.)

Other than the inference from the italicized words in the affidavit above quoted, there is absolutely no evidence that the purpose of the construction of the main ditch was to take care of the waters of Quinimosa and Mouser creeks, or

that the waters of said creeks ever flowed therein. The evidence is overwhelming that the ditch was put in and maintained for the purpose of draining the Morrison property, and the Morrison property only.

Let us first point out how the undisputed physical facts negative the idea that the ditch was excavated to take care of the waters of Quinimosa and Mouser creeks. The intake of the ditch in question is almost three quarters of a mile from the place where Mouser creek enters the old lake bed, and considerably more than a quarter of a mile from where Quinimosa creek comes in. During the greater part of the time that these creeks are flowing, the waters therefrom quickly spread out and disappear from sight a considerable distance south of the intake of the main ditch. It is only at times of flood and high water that there is any possibility that water from these streams would go as far north as the intake of the main ditch.

There is also evidence that, during certain seasons of the year, both of these streams dry up before they reach the old lake bed. Peter Morrison's description of perpetual streams flowing through the bed of the lake in a ditch was hyperbolic, to say the least, and is without support in the evidence.

Now, entirely apart from the physical facts, exhibit No. 21 establishes beyond peradventure that the so-called main ditch was not excavated to take care of the waters of Quinimosa and Mouser creeks. This exhibit is an agreement, dated September 29, 1903, which was to have been executed by Peter Morrison and by the four owners of the properties now owned by the appellants and Mrs. Helm. It recited that:

"WHEREAS, said Saltese Lake has been heretofore drained, but the said drainage is insufficient, and it is desired by the parties hereto to more completely and permanently drain the same,

"Now, THEREFORE, the said parties hereto, in consideration of the mutual promises made by each of the parties hereto to each and all of the others, do hereby covenant and agree to contribute to the improvement of the drainage of the said Lake equal amounts of money according to the acreage owned by each within the meandering lines of said former

Lake, for the purpose of draining the same and digging ditches along the following lines: . . . ”

This proposed agreement provided for the widening and deepening of what is referred to therein as the "outlet" ditch, which then ended at or about the point where we have previously indicated that the main ditch changes direction, and about one and three-eighths miles northwesterly from the present intake of the main ditch. It provided, further, for the construction of new ditches, one of which was

" . . . to commence at the southerly end of said outlet ditch and continuing in a southeasterly direction along or near the center line of said former lake, substantially as indicated by the line upon the plat, to a point on the east and west center line of section thirty-three (33)."

Three of the four owners of the property now owned by the appellants and by Mrs. Helm signed the proposed agreement, exhibit No. 21, but it did not become effective and the plan outlined therein was not carried out, because the fourth, the witness H. L. Needham, who at that time owned part of the land now owned by the appellants, was advised not to, and refused to, sign the agreement. As he testified, Peter Morrison thereupon immediately *closed the ditches*.

The ditch described above was later built by the Morrisons and is the main ditch, but, apparently for prudential reasons, it was not extended to the east and west center line of section 33; instead, the intake was established at a point sixty feet north thereof.

Under the plan outlined in exhibit No. 21, this ditch was to branch when it got to the east and west center line of section 33; one branch was to run in a southeasterly direction to an intersection with Quinimosa creek, and the other was to run in a southwesterly direction following the line between the properties of Mrs. Helm and the appellants, to a certain point, and thence in a southeasterly direction to intersect Mouser creek.

It is obvious that when Peter Morrison did build this ditch, he built it to drain his own land, and he stopped sixty feet north of his south boundary (the east and west center line

of section 33) to preclude any possibility that the owners of the property to the south of him might make any physical connection with his ditch.

Not only the respondents, but their present and former employees, and two of appellants' witnesses, testified as to dams maintained in previous years by the respondents and by Peter Morrison, their predecessor in interest, in the main ditch at or near the site of the one here complained of.

■ It seems to us to be clearly established that, although there had at one time been a plan to take care of the waters of Quinimosa and Mouser creeks, it never materialized; that when the Morrisons' ditch was built, it did not and was not intended to take care of the waters of those creeks; and that the respondents, and their father before them, have at all times insisted on the right to dam the ditch and to prevent the appellants and their predecessors in interest from claiming any right to run water from any source whatsoever through their ditch.

Any rights the appellants may have in the main ditch as a substituted natural watercourse must be derived from prescription, dedication, or estoppel. The respondents' conduct through the years has definitely negatived prescription or dedication, and there is no estoppel pleaded or relied on, nor could there be any, based on the evidence in this record. If there is any natural watercourse involved in this case, it is definitely not the main ditch, and it must be all of what was Saltese lake.

If the Saltese lake basin ever was a natural watercourse, it has long since become reclaimed farming land, primarily valuable for its rich soil and the use that can be made of it for raising crops and for pasturage. Each year a large part of the lake bed is subject to overflow in the high-water season, but, because of the greatly deepened outlet and the extensive drainage system built and maintained at the expense of the Morrisons, the waters are drained off and the lands made available for pasture and crops through the summer and fall.

■ The waters which periodically inundate the Saltese lake basin, under the circumstances here existing, should be

classed as flood and surface waters. If the appellants desire additional drainage facilities to dispose of such waters, they can secure drainage rights either from the respondents or by virtue of Rem. Rev. Stat. (Sup.), § 936-1 [P.P.C. § 32-1]. Appellants, however, apparently prefer the less expensive method of utilizing the drainage system of respondents, and have invoked the rule relative to natural watercourses and are relying on their riparian rights thereunder. We will, therefore, consider the rights and obligations of respondents and appellants from the standpoint of their being riparian owners on a natural watercourse. This discussion will make it apparent that the appellants seek to make complex a comparatively simple flood-water problem, by applying the totally inappropriate remedy of the law of riparian ownership.

It is the rule in this state that flood waters not within the banks of a stream are surface waters and a common enemy against which each landowner is entitled to protect himself. *Cass v. Dicks*, 14 Wash. 75, 44 Pac. 113, 53 Am. St. 859; *Harvey v. Northern Pac. R. Co.*, 63 Wash. 669, 116 Pac. 464; *Morton v. Hines*, 112 Wash. 612, 192 Pac. 1016.

The primary rights of a riparian owner, as stated by Farnham in his text, The Law of Waters and Water Rights, are: (1) to have the stream flow past his property in its natural condition (vol. 2, p. 1573) (generally speaking, the owner above cannot divert or pollute the stream, and the owner below cannot raise the level of the water by dams or other obstructions); (2) to such use of the water as it flows past his land as he can make without materially interfering with the common right of other riparian owners (vol. 2, p. 1577); (3) to whatever the water produces, such as ice (vol. 2, p. 1601).

The texts and cases continually refer to the rights and obligations of "upper" and "lower" ownerships. We have here a situation where, under appellants' theory, the respondents would be, technically, "lower" owners. On a flowing stream, the draining off or diversion of water by a lower owner would not ordinarily affect the upper owner, because the water would already have passed his property;

but the fact is that the lands of appellants and respondents are so nearly on the same level that a diversion or drawing off of water from their land by respondents also, to a considerable extent, diverts or draws off water from the land of appellants. The respondents have thus drained water off the appellants' land by deepening the outlet at the north end of Saltese lake and by constructing and maintaining drainage ditches on their own property.

Farnham says, in vol. 2 of the text above referred to, p. 1618:

"The owner of land on the margin of a natural lake or pond has a right to have the natural level of the water maintained, so as to permit him to enjoy the advantages attendant upon riparian ownership, and to protect him from the disadvantage of having a strip of uncovered lake bottom left in front of his property."

It is obvious that appellants, as riparian owners on a natural watercourse, are not interested in maintaining the natural level of the water, and that they do not object to having an uncovered lake bottom; in fact, that is what they want.

Respondents, as lower riparian owners, may do as they please with the water which flows over their lands, so long as they do not interfere with the rights of the appellants and other riparian owners.

Suppose respondents decide that they no longer want to farm their land, but believe that it would be more valuable as a lake resort. Suppose they restore the outlet to its former depth, close all their drainage ditches, and put everything on their land back to where it was in 1892, and ultimately the water resumes its former level. Can appellants, as riparian owners, complain if the watercourse be restored to its pristine beauty of tules and rushes? It becomes obvious that what the appellants want is that the respondents continue their diversion of water by drainage ditches so that appellants may have dry land instead of a natural watercourse, but they cannot compel the respondents to maintain the ditches.

Two illustrative cases will make our point clear. In *Drainage Dist. No. 2 v. Everett,* 171 Wash. 471, 18 P. (2d) 53, 88

A. L. R. 123, it was held that a city could abandon the use of a dam and permit a stream to flow in its natural course, notwithstanding the damage and inconvenience to those below the dam. The first headnote (88 A. L. R. 123) reads:

"Neither the maintenance for the prescriptive period of a dam impounding the waters of a stream, nor the maintenance for the prescriptive period of drainage ditches by a drainage district organized by lower proprietors sufficient only to take care of the diminished flow, and their enjoyment for such period of the land thus reclaimed, give the drainage district a right to have the condition so created continued for its benefit."

The court said:

"The lower proprietors (the owners of the land within the drainage district) who had improved their property with reference to the change in the course of the stream and the impounding of its waters by appellant, and in reliance on the continuance of that condition, did not acquire a reciprocal right to have the artificial condition remain undisturbed. The appellant could not be compelled to maintain the dam for the benefit of the lower proprietors. The right to maintain the dam, like other rights, could be abandoned. If the doctrine of reciprocal rights obtains, then appellant could never abandon its easement, but must forever maintain the dam for the benefit of the respondent and its successors. . . .

"No right of the respondent was invaded by the appellant. The reservoir was legally constructed and maintained. The appellant had the legal right to discontinue the use of that reservoir at any time it saw fit."

In *Schulenberg v. Zimmerman,* 86 Minn. 70, 90 N. W. 156, the facts and holdings are clearly set forth in the second headnote, which reads as follows:

"A natural water course, which drained the land of the plaintiff, was deepened on the land of the defendants by constructing a ditch in the channel thereof. More than twenty years thereafter the defendants filled the ditch, but *not higher than the bed of the natural water course.* This action was brought to compel the defendants to restore the ditch to its former condition. *Held,* that the plaintiff acquired no right, by prescription or otherwise, to have such ditch maintained as originally constructed." (Italics ours.)

Except as to any portion of the dam which may have been higher than the bed of the natural watercourse, this is identical with the present case.

It would also follow that appellants, as upper riparian owners, might insist that the old level of the lake be restored and that respondents be required to restore the outlet to its original condition. However, they would be met by a claim of estoppel because the appellants and their predecessors in interest had not only stood by and watched the respondents and their predecessor in interest spend thousands of dollars in deepening the outlet and establishing and maintaining ditches, but H. L. Needham, who then owned part of the property now owned by the appellants, worked on the deepening of the outlet and the construction and maintenance of the ditches and was paid therefor by Peter Morrison. (We are not here attempting to forecast the decision should the various parties, through spite or otherwise, attempt to assert their riparian rights on a natural watercourse as here suggested, but are merely pointing out some of the possibilities which would be involved in holding Saltese lake to be a natural watercourse.)

We have, thus far, considered the right of riparian owners not to have the level of the natural watercourse lowered. They also have the right not to have it raised. No right of the appellants, as riparian owners on a natural watercourse, has been infringed unless it can be established that so much of the dam complained of as may project above the bed of Saltese lake casts some burden of excess water upon the land of the appellants.

We have here an obstruction extending upward ten or twelve inches above the lake bed and which is from ten to twenty feet in length, located at about the middle of a natural watercourse which at that point is more than four thousand feet in width. The trial court could not see, nor can we, why the water would not run around both ends of such an obstruction. However, let us assume, for the moment, that it would force back certain waters onto appellants' land. Respondents, by their deepening of the outlet and their system of drainage ditches, have lowered the level

of the water in the natural watercourse considerably more than they could possibly raise it by such an obstruction. It would seem that appellants would have to establish that this obstruction had raised the water above the level existing when the respondents started their lowering of the water level, before there would be any actionable damage.

As long as the water level of the natural watercourse has not been raised, appellants cannot complain merely because there is more water on their land than they would like to have. Their recovery must be predicated, not on terms of the value of a privilege, but on the existence of a right.

It seems to us that appellants are merely the owners of re-claimed farm lands which are periodically flooded, but, if they be riparian owners on a natural watercourse, they have not established that the dam in question is such a use by the lower riparian owners as to interfere with their riparian rights.

It follows that the appellants have no cause of action against the respondents on the theory of a violation of their riparian rights.

We are, moreover, prepared to hold with the trial court that Saltese lake was not a natural watercourse. The maps in evidence show that three creeks emptied into the lake, and the pictures show that the foothills came down to the lake on the easterly side, and that the lake was a natural drainage basin for a considerable area of hill country. (Only two of the creeks are referred to in the evidence, as one entered the lake north of the dam involved in this case.) Mr. H. L. Needham, who was called as a witness by both parties and who had been familiar with the lake since 1898, made it clear that the level of the lake went down during the summer months because the ground absorbed the water (and there must of necessity have been a considerable amount of evaporation), and that the water went out the outlet, or overflowed, only when the lake level was high. When Mr. Needham worked for Peter Morrison lowering the outlet in November, 1898, there was no water where they were working. The outlet at that time was about three feet deep and they lowered it two feet. Even after that, the water did not

run out of the lake the year around. (The outlet has been lowered from time to time, until it is now from thirteen to fifteen feet in depth.)

It seems to us that Saltese lake, while a natural drainage basin, was not a natural watercourse, for during most of the year there was no flow out of the lake. We readily agree that the flow of a stream can be intermittent and it still be a natural watercourse; however, current, or flow, is one of the essential elements of a watercourse and is stressed in all of the decisions relied on by the appellants. The topography of the surrounding country makes it clear that there would be a very rapid runoff of rain or melting snows into the Saltese lake basin from the surrounding hills, and at such times there would be an overflow at what is referred to as the outlet. This overflow water ran a short distance into what is known as Shelley's lake, or a sinkhole, where it disappeared. This overflow outlet was not an outlet as that term is used in the cases relied on, where water from a stream comes into a lake at one point and flows out at another, thus preserving the continuity of a watercourse. Water which came into Saltese lake when these creeks were flowing, or from any other source, came to rest in the lake and escaped as overflow only at certain seasons of the year. Even after the outlet was lowered very materially, that situation continued.

Conceding that the affidavit of Peter Morrison and other records which were excluded should have been admitted, it is our opinion that there was not only ample but clearly preponderating evidence to sustain the holding of the trial court that Saltese lake was not a natural watercourse.

The judgment of dismissal by the trial court will be affirmed. While any discussion of the question of damages is unnecessary, it may be said in passing that the preponderance of the evidence supports the trial court in its finding that most of appellants' lands were flooded before the dam in question was installed in the ditch.

MILLARD, STEINERT, ROBINSON, SIMPSON, JEFFERS, and SCHWELLENBACH, JJ., concur.

ABEL, J. (dissenting)—I dissent. Peter Morrison, father of the respondents, who acquired title to their land in 1892 and lived there until after 1915, was involved in a lawsuit concerning this land (*Denee v. Morrison*, 95 Wash. 76, 163 Pac. 382), and, on July 15, 1914, he signed the affidavit referred to in the majority opinion. This affidavit should have been received in evidence. The rule is stated in 20 Am. Jur. 517, § 604, as follows:

"A declaration of a former owner in thè nature of an admission against interest is, as to real estate at least, admissible against his successors in title to show the character of the possession of the declarant or the title under which he held, provided the matter is one which may be proved by parol evidence and the declarant possessed a proprietary interest at the time he made the statement."

The decision in this case depends upon whether water flowing from the south to the vicinity of the beginning of the main ditch on respondents' land, and thence down the main ditch to the outlet in the north, constitutes a watercourse.

In 4 Restatement of the Law of Torts 317, § 841, under the subject of watercourses, there is this statement:

"(1)    The term 'watercourse,' as used in the Restatement of this Subject, comprehends a stream of water and its channel, both of natural origin, where the stream flows constantly or recurrently on the surface of the earth in a reasonably definite channel.

"(2)    The term 'watercourse' also comprehends springs, lakes or marshes in which such a stream originates or through which it flows.

"*Comment:*   .   .   .

"c.    *Constant or recurrent flow.* Many streams have a constant flow. Some streams flow only periodically or occasionally, and do not exist in time of drought. When the other elements of a watercourse are present, the question whether a periodic or occasional flow constitutes a stream depends upon whether the flow is of such frequency, duration and volume as to make it practicable and desirable in that particular part of the country to classify it as a watercourse, at least for the particular purpose for which its use is being claimed.

"*Illustrations:* . . .

"9. A stream originates in and flows out of a marsh into a definite channel. The marsh is the place where the watercourse begins and is, itself, a part of the watercourse. . . .

"A watercourse does not terminate when it flows into another watercourse. Each branch from its beginning and the stream into which it flows from the point of confluence are one watercourse. Thus there are as many watercourses as there are branches. A stream may flow for some distance underground, or it may flow through a lake or marsh. So long as the water continues to flow and eventually resumes its normal form as a stream in a reasonably definite channel its continuity is not broken for legal purposes."

Section 842, p. 325, states, in part:

"*Comment:* . . .

"d. *Lakes as part of a watercourse.* Lakes normally come into existence as a result of the forces of nature, and may or may not be a part of a watercourse. Lakes may be formed, however, by artificial obstruction of a stream or by the diversion of a stream into a dry depression. Such lakes, even though artificially created, are segments of a watercourse . . . and are within the definition stated in this Section."

*Rigney v. Tacoma Light & Water Co.,* 9 Wash. 576, 38 Pac. 147, was a case where two creeks flowed into "Smith's swamp or lake," where the waters were commingled; an outlet at the westerly end forming what was called Clover creek. The court stated:

"The evidence discloses that Smith's swamp covers an area of one hundred acres, or more, nearly all of which, in its natural state, was covered with water during the rainy season, but at other times of the year became comparatively dry, except around the margin, where the water always remained."

The court found that the entire water system constituted a watercourse and restrained interference with the water of the upper creeks, at the suit of the plaintiff, whose riparian rights on the outlet creek were interfered with.

In *Hastie v. Jenkins,* 53 Wash. 21, 101 Pac. 495, the court was concerned with a chain of lakes in Grand Coulee in

Douglas county. We held that what was known as Outlet creek was the only means by which the lakes could divest themselves of water during the high water season and that it constituted a watercourse. Damages were awarded and an injunction granted against obstruction of Outlet creek.

In *Ronkosky v. Tacoma,* 71 Wash. 148, 128 Pac. 2, the city of Tacoma had constructed a fill and culvert across a natural watercourse. The city allowed the culvert to become somewhat clogged, and heavy rainfalls caused a flood, which damaged plaintiff's property situated along the stream above the fill. We stated:

"The respondent contends that these actions were properly dismissed under the 'common enemy' doctrine of the common law as applied to surface water. It is urged that the decisions of this court, in *Cass v. Dicks,* 14 Wash. 75, 44 Pac. 113, 53 Am. St. 859; *Harvey v. Northern Pac. R. Co.,* 63 Wash. 669, 116 Pac. 464, and *Wood v. Tacoma,* 66 Wash. 266, 119 Pac. 859, are determinative of the issue; and that, as a matter of law, the city was under no obligation to furnish drainage for surface water. For two good reasons the doctrine announced in those decisions has no application to the facts here presented.

"(1) In the first place, when water, from whatever source, is collected into a natural stream or watercourse, where the drainage of the surrounding country has been accustomed immemorially to flow, it is no longer an outlaw or common enemy. Such a stream must be recognized as a permanent physical condition, with which no one may with impunity interfere to the detriment of another."

In *Miller v. Eastern R. & Lbr. Co.,* 84 Wash. 31, 146 Pac. 171, we had a situation where flowing waters from a gulch moved onto plaintiff's land, spreading out over and across plaintiff's lowlands, by natural gravitation, and finding its way into a watercourse. We held this to constitute a watercourse, as distinct from surface waters.

The case of *Peterson v. Arland,* 79 Wash. 679, 141 Pac. 63, dealt with damage to land, on a stream, caused by a log jam. In this case, the bed of the river or stream had been changed. The damage was caused partly, by forcing the water back into the old channel. We stated, at p. 693:

"Certain other instructions requested were based upon the theory that, if the old channel had ever been a natural water course, the respondents cannot recover damages from the defendants for their act in forcing the water back to such old channel. This is not the law. The accustomed course of a stream which a riparian owner has the right to insist shall not be disturbed is not to be found in historical research, but is that which is its natural and apparently permanent course at the time when the right is called in question. 2 Farnham, Waters & Water Rights, § 489, p. 1636. There was ample evidence in this case that the old channel had been, for many years, obstructed and filled. It was that status which the respondents had the right to insist should not be disturbed by the appellants' negligent use of the river."

In *Trigg v. Timmerman,* 90 Wash. 678, 156 Pac. 846, we held that a swale, about five hundred feet wide, through which water percolated, constituted a watercourse and that the defendant was liable for obstructing the flow. This, also, was a case where the natural situation had been changed by the parties, and we held that this did not change its status as a watercourse in its changed condition.

The case of *Lambert v. Alcorn,* 144 Ill. 313, 33 N. E. 53, 21 L. R. A. 611, was cited, with approval, by this court in *Trigg v. Timmerman, supra.* There, the rule is stated as follows:

"The point that the proposed system of drainage is in fact an abandonment of the natural water-course, if one ever existed, is scarcely worthy of serious consideration. It assumes that a natural water-course, if used at all, must be used in its natural state, and is therefore incapable of improvement, either by being deepened or widened by artificial means, or by the construction along its course of a channel or drain beneath the surface, for the purpose of more effectually carrying off the surface water from the land. Or the assumption seems to be, that the construction of such improvements creates a substantively new water-course, in no way dependent upon the one provided by nature, and carrying with it none of the rights arising from the existence of the former. It is sufficient to say, that both common sense and the uniform decisions of this court are the other way. In the *Herrington* case it appeared in proof that an artificial ditch had been dug along the bed

of the natural water-course, deepening and straightening it, and removing intervening obstructions out of the way, and it was not supposed that the original channel, and all rights appertaining to it were thereby abandoned. It remained and was treated as constituting the same water-course it was before, and the defendant was held entitled to drain the surface water from his land into it in its improved condition."

There can be no question but that considerable surface water flowed into Saltese basin; however, the fact remains that there were two creeks which did flow into Saltese basin from the south, and that there was an outlet at the north which had been deepened a number of times.

The testimony of Millar Morrison and Harry Morrison, respondents, and the sons of Peter Morrison, shows that the dam was placed at the south end of the main ditch for the purpose of holding back the waters from Quinimosa and Mouser creeks, which flowed in from the south across appellants' land. Millar Morrison testified as follows:

"Q. And the purpose of the dam was to prevent the water from coming down into the Fourcorners and getting into the main ditch, is that correct? A. The purpose of the dam was to hold it back so we didn't have to take all their water in our place. Q. And the dam, during the high water season, does stop water from going into the main ditch, is that correct? A. Some."

This witness further testified:

"Well, our side of the story is that we don't want the water coming over these places and coming down our ditches. For the first thing, you have to work in them and they were allowing all the water to come in there, and then it makes it more expensive for us to operate the ditches, that is, to clean them out or work in them."

Respondent Harry Morrison testified that it was their intention to keep the dam permanently, and stated, on several occasions, that the purpose of the dam was to prevent the flow of water into and through the main ditch. For instance, he testified:

"Q. Just answer the question: You put the dam in for the purpose of stopping the water from coming into the

main ditch; there is no question about that, is there? A. Sure, I didn't want the water in there. We had been ditching there."

I think the majority opinion is wrong in accepting as true testimony from which it is found that

". . . the intake, or beginning, of this ditch is on ground which is a little higher than the surrounding lake bed."

The dam was approximately twenty feet wide and ten or twelve inches above the level of the ground. It is inconceivable to me that this dam could accomplish what respondents stated that they put it in for, if the foundation of the dam was on land a little higher than the surrounding lake bed. I believe that Harry Morrison and Millar Morrison finally admitted the truth, which was that the dam was placed there to keep the waters from the south from flowing into the main ditch and to the north. It would have been impossible to have accomplished this if the dam was placed upon higher ground, for the reason that the water would have flowed around the ends of a twenty-foot dam. The evidence was that dams had been placed in the main ditch and other ditches, but it did not show that dams had been placed on top of the ground.

The majority opinion passed over the affidavit of Peter Morrison with the statement that his

". . . description of perpetual streams flowing through the bed of the lake in a ditch was hyperbolic, to say the least, and is without support in the evidence."

Peter Morrison was not living at the time of the trial; however, he was the person who knew more about this land than anyone else, and, at a time when his right to this property was in question, in the case of *Denee v. Morrison, supra,* he signed an affidavit and filed it in that cause, and, in addition, the answer which he verified in that case supports the affidavit. I do not believe we should disregard such an affidavit by saying, in effect, that the statements made by Peter Morrison were exaggerations, and, if we take his affidavit as speaking the truth, then Mouser and

Quinimosa creeks, as they flowed into the Saltese basin and through the bed of the lake in a ditch, constituted a watercourse.

The judgment should be reversed.

MALLERY, C. J., concurs with ABEL, J.