[No. 32298.   Department Two.   July 29, 1953.]

ABNER SUND *et al., Respondents,* v. L. K. KEATING *et al., Appellants.*[1]

[1]Reported in 259 P. (2d) 1113.

*Arthur A. Giblin,* for appellants.

*J. W. Graham,* for respondents.

FINLEY, J.—The plaintiffs instituted an action in the superior court for Mason county to recover damages done to their oyster beds by defendants' allegedly negligent diversion of a stream. After a trial to the court, fact findings and conclusions of law adverse to the defendants were entered, and judgment was rendered thereon in the amount of five thousand dollars damages. The defendants have appealed.

Before the facts of this case become understandable, it is necessary to describe with some precision the locale involved and the nature of appellants' operations in connection therewith.

Respondents and appellants are adjoining landowners. The common boundary which separates their lands is known as W. C. Miller's Balanced U. S. Meander Line. In general,

this meander line runs north and south. The respondents' land lies to the east of this meander line and extends to the extreme low tide line of Hood Canal. The appellants' land lies west of the meander line and its western boundary extends to the Hood Canal highway.

A small creek, known locally as Clark's Creek, traverses the southern end of the property of both parties. In general, it runs from west to east. It passes under a small bridge located on the Hood Canal highway, then flows easterly across appellants' property, then across respondents' property, and empties into Hood Canal. The testimony is conflicting as to the dimensions of this creek, but it appears it is ordinarily some fifteen to twenty feet wide and about eighteen inches deep. From May to October, the creek is usually dry; but during the rainy season water regularly flows in it, and at flood stages the creek often overflows its otherwise normal course.

In regard to the property of the parties, through the central portion of both tracts (running in an east-west direction) there is a ridge of land some three to four feet higher than the northern and southern extremities of the tracts. From the top of this ridge, the land slopes gently toward the north and south boundaries of the adjoining tracts. Respondent Sund testified that, in relation to the creek, this ridge is about fifty to sixty feet north of the north margin of Clark Creek. There is also testimony in the record to the effect that, before a portion of this ridge was removed by appellants, it had always served as a natural barrier to protect respondents' land from injury by flood waters and had served to keep the flood waters within the natural channel of the creek.

Appellants wished to improve their property by building a parking lot adjacent to their place of business. The parking lot was to be built by taking materials from another portion of appellants' land and building up an area which theretofore had been inundated in times of high tide. Accordingly, appellants employed a bulldozer operator to remove gravel and material from the natural ridge and to

push the dirt westerly toward the parking area. A cut, running north and south, was made along appellants' east boundary line (the meander line). This cut was sloping in nature and varied in depth from about three to four feet below the surface of the rest of the ridge to zero feet, some forty feet west of the meander line.

After the cut was started, respondents wrote appellants, stating their fears that high tides might do damage to respondents' oyster beds by washing thereon loose gravel. A meeting between the parties was proposed, but none took place. After the completion of the cut, in May of 1949, respondents again wrote the appellants, this time expressing their fear that, since so much gravel had been removed from the ridge, the creek might be diverted because of the weakness of the bank, and that a diversion of the stream would damage respondents.

Neither party then did anything to prevent an overflow of the creek at flood time, except that the respondents engaged a bulldozer to deepen the channel of the creek and placed a log at the north bank of the creek.

Toward the latter part of October (shortly after the respondents' second letter), a freshet of considerable proportion occurred. The waters found their way through the excavated portion of the ridge and carried much debris and gravel onto respondents' oyster beds, covering them to a depth of about two feet. Soon after the flood, the stream receded to its normal course.

The gist of the respondents' complaint is that the appellants were liable for negligently conducting their excavating operations by leaving the bank of the stream weakened, thus making it susceptible to giving way in the event of high flood waters. Following a trial without a jury, the court found, in substance, that the appellants had removed a portion of the north bank of Clark Creek, and thereby had created a dangerous condition in event of a flood; that the appellants had refused to take the precautions suggested to them by respondents, such as building a bulkhead to retain the banks of the stream; that, because of the flood, the

waters of the stream were diverted onto respondents' land, and that damages in the extent of five thousand dollars were caused by the acts of appellants.

Before we reach the questions presented by this appeal, certain observations are necessary relative to the pleadings and the theory on which the case was tried. As already noted, the theory of the pleadings is that respondents have a good cause of action for negligent diversion of a watercourse by reason of appellants' excavation so close to the bank of the stream as to cause the bank to give way and be overflowed at flood time. Although the respondents claim in their brief that the waters of the creek "were deliberately diverted" through respondents' land, there is absolutely no evidence in the record to support this contention—that is, nowhere in the record do we find any evidence showing that appellants *deliberately* cut into the channel or banks of Clark Creek *with the intent of diverting the creek*. Since the cause of action is one based on diversion of a watercourse, the applicable body of law is that relating to watercourses and riparian rights—not the law relative to surface waters. However, because of certain statements we have made in previous cases to the effect that flood waters are surface waters, and hence, being the common enemy, are governed by the rules on surface waters, the trial court approached this case as one involving the law of surface waters.

In the trial court and on appeal, the appellants contended that, since the damages here were caused by flood waters, and since flood waters are surface waters, the common enemy rule was controlling as it is applied in this state with reference to surface waters. Appellants claim that, under the line of authority established by *Cass v. Dicks,* 14 Wash. 75, 44 Pac. 113, they were privileged to fend off the common enemy (surface waters) as best they saw fit, and that any injury to respondents was *damnum absque injuria.* On the other hand, in order to avoid the legal consequences which follow once it is found that the damages were caused by surface waters, respondents (both in the trial court and on appeal) took the view that the case at bar is controlled

by a line of cases of which *Noyes v. Cosselman,* 29 Wash. 635, 70 Pac. 61, is representative. In that case, we recognized an important qualification respecting the common enemy rule and held that, while vagrant surface waters could be dealt with as a landowner saw fit, once these waters became collected and were confined by natural barriers one could not by artificial means cast them in a body on the land of an adjoining landowner.

We note that many of the contentions of the parties rest on (a) whether the ridge which appellants excavated constituted a "natural barrier" which confined "collected" surface waters on appellants' land, within the meaning of the *Noyes* case; or (b) whether the waters in the case at bar were "surface waters arising from sources apart and away therefrom," within the meaning of *Morton v. Hines,* 112 Wash. 612, 192 Pac. 1016. We also note that the trial court, in its memorandum opinion, stated that the case was governed by *Noyes v. Cosselman, supra.*

The trial court and counsel spent considerable time in discussing principles of law relative to surface waters, and their applicability. Actually, the case is governed by principles of law relating to riparian rights, and the action is one for negligent diversion of a watercourse. In view of our past decisions, which seem broadly to classify all flood waters as surface waters, a close examination of those decisions is advisable to distinguish the principles of law there involved from those governing the case at bar.

The cases usually cited in support of the proposition that waters overflowing from a river in flood time are surface waters are: *Cass v. Dicks, supra; Harvey v. Northern Pac. R. Co.,* 63 Wash. 669, 116 Pac. 464; *Morton v. Hines, supra;* and *DeRuwe v. Morrison,* 28 Wn. (2d) 797, 184 P. (2d) 273. Because the flood waters involved in the *Cass* case were not confined within the channel of a natural watercourse, we assumed, without discussion, that the case was governed by the law of surface waters. In the next case involving this point, *Harvey v. Northern Pac. R. Co., supra,* we noted that the flood waters had already escaped over the banks of the stream, and, on the authority of the *Cass* case, we

treated them as surface waters, subject to the common enemy rule. In the *Morton* and *DeRuwe* cases, *supra*, we restated the rule—that waters *escaping* from the banks of a stream become surface waters and are subject to the laws governing such waters.

In none of these cases have we decided whether flood waters, still remaining within the confines of the flood channel of a stream, are an integral part of the watercourse and governed by the laws relating to riparian rights, or whether they are surface waters. If the law of riparian rights governs here, then one of the rights of respondents, as a riparian owner, was to have the water of Clark Creek continue to flow in its natural course. As a corollary of this right, appellants, either intentionally or negligently, could not divert the course of the stream. 2 Farnham, Waters and Water Rights, 1634-1637, §§ 489-490. And, if appellants so negligently excavated near the bank of a stream that flood waters of the stream caused it to change its course, then appellants are liable. *Rau v. Minnesota Valley R. Co.*, 13 Minn. 442; 2 Farnham, *supra*, 1637, § 490.

The almost incredible conflict of authorities as to when and under what circumstances flood waters become surface waters, so as to be governed by rules relating to the latter rather than by the rules of riparian rights, is set out in 3 Farnham, *supra*, 2558-2569, §§ 879-880b. The weight of authority inclines to the view that surface water, which has joined the course of a stream and has become subject to its current, ceases to possess the characteristics of diffused or vagrant surface waters and becomes part of the stream, and hence is governed by the laws relating to riparian rights. 3 Farnham, *supra*, 2558, § 879; Hutchins, Selected Problems in the Law of Water Rights in the West (U.S.D.A. 1942 Misc. Pub. No. 418), 18, 19. However, the law of surface waters is applicable, once the facts show that the waters have become "diffused surface waters" as opposed to surface waters flowing within a watercourse.

The logical underpinning for the majority view is that a stream must be viewed as consisting of its normal banks and what is termed its "flood channel." So long as

the waters remain within this flood channel, the flood waters are properly classifiable as riparian waters. The following quotation from 3 Farnham, *supra*, 2561, § 880, is relevant here:

"§ 880. Right to fight flood water.—To determine how far flood water in a river may be fought as a common enemy the form which the water assumes must be taken into consideration, and the facts of each case dealt with by themselves. Every stream flowing through a country subject to a changeable climate must have periods of high and low water. And it must have, not only its ordinary channel which carries the water in ordinary times, but it must have, also, its flood channel to accommodate the water when additional quantities find their way into the stream. The flood channel of the stream is as much a natural part of it as is the ordinary channel. It is provided by nature, and it is necessary to the safe discharge of the volume of water. *With this flood channel no one is permitted to interfere to the injury of other riparian owners.* . . . Thus, the courts are very nearly agreed that the flood channel must be considered as a part of the channel of the stream, and that no structures or obstructions of any kind can be placed in its bed which will have a tendency to dam the water back upon the property of the upper riparian owner." (Italics ours.)

The same view is expressed in *O'Connell v. East Tenn. V. & G. R. Co.*, 87 Ga. 246, 13 S. E. 489. There, Judge Lumpkin of the Georgia court, in considering how flood waters which remained in the channel of a stream were to be classified, said:

"Thus it is material to consider whether the overflow as above stated is properly classed with surface water. This depends upon the configuration of the country and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current, or leaves the stream never to return, and spreads out over the lower ground, it has become surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel *animo revertendi*, presently to return, as by the recession of the waters, it is to be regarded as still a part of the river. The identity of a river does not depend upon the volume of water which may happen to flow down its course at any

particular season. The authorities hold that a stream may be wholly dry at times without losing the character of a watercourse. So, on the other hand, it may have a "flood-channel" to retain the surplus waters until they can be discharged by the natural flow. The low places on a river act as natural safety-valves in times of freshet, and the defendant claims the right to stop up one of these without liability for ensuing damage." (p. 247)

In the *O'Connell* case, *supra*, the court held that the flood channel could not be interfered with without incurring liability, inasmuch as the waters were not surface waters proper.

■ With these principles in mind, we turn to the assignments of error. The first assignment of error is that the trial court erred in finding that the appellant Keating removed a portion of the north bank of the creek. Although the fact finding reads "east" bank, the trial court apparently meant the "north" bank. If we consider Clark Creek in its normal dimensions of fifteen to twenty feet in width, then, quite obviously, the fact finding was error, inasmuch as, by respondents' own testimony, the excavation here was some fifty to sixty feet north of the north margin of the stream. But, viewing the high central ridge which traversed the parties' lands as a natural barrier, which constituted part of the flood channel of the stream, and which, apparently for some forty years, had served to keep annual flood waters in check and had prevented their harming respondents' land, then the fact finding would not be erroneous. Considering the ridge as a natural barrier and a part of the flood channel, it could not be disturbed by appellants so as to cause the water to flow where otherwise it would not without liability for injury resulting to respondents' property. 3 Farnham, *supra*, 2565, § 880.

■ Keeping in mind the authorities discussed above, if the waters were in the flood channel of a stream, then certain principles become self-evident: (a) They are properly classified as riparian waters rather than surface waters; (b) being riparian waters, the rules relating to watercourses would apply. This holding is not inconsistent with the line of authority established in *Cass v. Dicks, supra*, where

waters which have *escaped over the banks* of a stream and have become diffused and vagrant surface waters (no longer properly a part of the watercourse), were properly classified as surface waters. As a consequence of the applicability of the law of riparian waters, appellants in the case at bar could neither intentionally nor negligently disturb the channel of the stream for their own purposes or to flood respondents' land; nor could they interfere with the flood channel of the stream—for that, also, is properly regarded as part of the stream. Unless it is shown that flood waters topped the banks of the flood channel or escaped from some *natural* outlet of the channel, the waters are riparian in nature. Hence, cases such as *Noyes v. Cosselman, supra,* and *Cass v. Dicks,* are inapplicable.

The trial court's finding No. 12 reads:

"12. That the damage was caused by the acts of defendants."

Under the caption "Conclusions of Law," we note that the trial court indicated:

"From the foregoing findings of fact the court arrives at the following conclusion of law, to wit:

"That plaintiffs are entitled to judgment against the defendants and the community composed of defendants in the sum of $5000.00 together with their costs herein."

■ As pointed out above, the trial court followed the theory applied in *Noyes v. Cosselman, supra,* in deciding that appellants were liable. We have indicated the reasons we think that case is not applicable. We have discussed another theory, and the reasons behind it, on the basis of which we think the appellants, nevertheless, are liable. The trial court's "Conclusions of Law" do not specify whether he concluded liability was absolute or should be based upon negligence. Finding No. 12, to the effect that plaintiffs' (respondents') injuries were caused by defendants' (appellants') acts, is amply supported by the evidence and it will not be overturned. This finding, and the evidence encompassed by it, support a specific conclusion that appellants were negligent.

■ It would have been helpful if the trial judge had

specifically indicated his theory of liability in this case. However, we have held that, if a trial judge can be sustained on a theory different than that indicated in his decision, the judgment will not be reversed. *Senior Citizens League v. Department of Social Security*, 38 Wn. (2d) 142, 228 P. (2d) 478, and cases cited therein.

As stated above, we find that finding No. 12 reasonably supports a conclusion of law that appellants were negligent, and that liability properly may be imposed on the "riparian rights" theory (expounded upon at some length heretofore), and it is our conviction that the judgment as to liability must be sustained.

■■ As to appellants' claim that damages here are speculative and conjectural, it seems sufficient to cite our recent decisions in *Gaasland Company v. Hyak Lumber & Millwork*, 42 Wn. (2d) 705, 257 P. (2d) 784; *Dunseath v. Hallauer*, 41 Wn. (2d) 895, 253 P. (2d) 408, wherein we pointed out that while uncertainty as to the *fact of damage* is fatal; nevertheless, uncertainty as to *the amount* or *quantum* of damages is not to be regarded, similarly, as fatal to a litigant's right to recover damages. The fact that respondents are engaged in the oyster business only as a side line does not detract from their loss. We are convinced there is ample evidence in the record to support the trial court's assessment of damages in the sum of five thousand dollars.

In passing, we wish to observe that it has been difficult to derive help from the maps and exhibits sent up on this appeal. This was occasioned by the fact that the location of the particular excavation was disputed. Various witnesses at the trial referred to certain portions of the exhibits merely by pointing, and saying, "here," or "there," and so forth. Such vocal indications can no more come up in the record than can the voice of the witness. For the assistance of the appellate court, all statements should be clearly referenced by markings, symbols, or other means of identification on the exhibits.

The judgment of the trial court is hereby affirmed.

GRADY, C. J., HAMLEY, and DONWORTH, JJ., concur.

SCHWELLENBACH, J., concurs in the result.