[No. 81257-8.   En Banc.]

Argued May 26, 2009.   Decided September 2, 2010.

DON L. FITZPATRICK ET AL., *Respondents*, v. OKANOGAN COUNTY, *Petitioner*.

600

*Mark R. Johnsen* (of *Karr Tuttle Campbell*), for petitioner.

*John M. Groen* and *Samuel A. Rodabough* (of *Groen, Stephens & Klinge LLP*), for respondents.

*Brian T. Hodges* on behalf of Pacific Legal Foundation, amicus curiae.

¶1 ALEXANDER, J. — In 2002, after the Methow River washed away a substantial portion of their property, the owners of the property brought suit against Okanogan County (County) and the State of Washington. In their complaint, they alleged that a public flood control project was the cause of the damage to the property. The trial court subsequently granted the County and State's motion for summary judgment dismissing the property owners' suit. The owners then appealed to the Court of Appeals, which reversed the trial court. *Fitzpatrick v. Okanogan County*, 143 Wn. App. 288, 177 P.3d 716 (2008). We granted the County's petition for review in order to

address whether the owners may maintain an inverse condemnation claim against a government entity for property damage allegedly caused by a public flood control project and, if they can, whether they raised a factual issue that should have precluded entry of a summary judgment dismissing their action. *Fitzpatrick v. Okanogan County*, 164 Wn.2d 1008, 195 P.3d 86 (2008). We affirm the Court of Appeals, concluding that the County and State have no immunity from liability for a taking claim and that there are genuine issues of material fact that preclude summary judgment.

I

¶2 At all times material to this case, Don Fitzpatrick, Pam Fitzpatrick, Brad Sturgill, and Heather Fitzpatrick Sturgill (owners) were the owners of a residential lot in Okanogan County. The property, which the owners purchased in 1980, fronts the Methow River near the town of Mazama. In 1986, the owners built a log house and garage on the property. These buildings were situated approximately 80-100 feet from the river and were outside the 100-year flood level. During a high-water event in June 2002, the river changed its course and washed away the log house and a substantial amount of the real property on which it was situated. The owners characterize the high-water event as a "2-year storm event" precipitated by the rapid melting of snowpack in the North Cascades. Clerk's Papers (CP) at 145.

¶3 A dike referred to as the "Sloan-Witchert Slough Dike" lies one-half mile upstream from the subject property on the opposite bank of the Methow River. The dike was originally built in the early 1970s by other private landowners. Starting in 1978, following a series of floods that damaged Washington State Highway 20 and other property, the County began making improvements to the dike. With involvement from the Washington State Department of Transportation, major improvements to the dike were

implemented by the County in 1983, 1987, and 1999. Currently, the Sloan-Witchert Slough Dike provides flood protection for Highway 20, two Mazama irrigation district channels, the "Kumm-Holloway Ditch" and the "McKinney Mountain Ditch," a county recreational trail, and private property.

¶4 After the 1999 improvements, Al Wald, a hydrogeologist for the Washington State Department of Ecology, provided a memorandum to the county shoreline permits coordinator. In it, Wald explained that, in his view, the dike work impacted the Methow River by cutting off natural overflow channels. He indicated that this had the effect of compressing more flood flow into the main channel and reducing the natural flood conveyance capacity of the river.

¶5 After the owners' home was swept away, they brought suit against the County and State, alleging that the dike caused the river to change its course and wash away their property.[1] Their complaint contained claims for inverse condemnation, trespass, negligence, and wrongful injury or waste to property. The County and State each responded by moving for summary judgment. In response to the motions, the owners presented evidence to the trial court that the Sloan-Witchert Slough Dike blocked several naturally defined watercourses that were side channels to the main stem of the river. According to the owners' expert, Dr. Jeffrey Bradley, "[t]hese side channels relieve flow from the main channel as the water level rises during a high flow event." *Id*. at 132-33. Dr. Bradley also opined that the owners' home would not have been washed away if the river's access to the side channels had not been obstructed.

¶6 In support of their summary judgment motion, the County and State cited the common enemy rule and statutes that grant immunity to government entities from claims arising from flood control work. These defendants

---

[1] The State maintains that it does not have a sufficient proprietary interest in the dike to render it liable for damages claimed by the owners. That issue is not before us and is one to be resolved by the trial court on remand.

also asserted that the owners failed to establish the essential elements of their liability claims. The trial court granted the motions for summary judgment, determining that there were no genuine issues of material fact and that, as a matter of law, the County and State were entitled to prevail. The owners moved for reconsideration of that ruling. In response, the trial court affirmed its earlier ruling, indicating that the plaintiffs' arguments were previously rejected in *Halverson v. Skagit County*, 139 Wn.2d 1, 983 P.2d 643 (1999), and noting that the county and state actions were "intended to keep the river within its natural banks and protect property from the flood waters. That appears to be the idea of the common enemy doctrine." CP at 273.

¶7 The owners appealed to Division Three of the Court of Appeals. In a divided decision, that court reversed the trial court, holding that the common enemy rule does not apply if a landowner obstructs a watercourse or natural drainway or prevents water from entering a flood channel. Since the owners had presented evidence that the dike blocked the side channels through which high waters would have otherwise flowed, the Court of Appeals determined that there were material issues of fact that precluded summary judgment. That court also determined that the County and State were not immune from the owners' inverse condemnation claims and that they could be liable for damages resulting from their affirmative acts.

¶8 We thereafter granted the County's petition for review[2] to address the issue of whether the owners' inverse condemnation claim may proceed against the County and State in light of the common enemy rule.

## II

■ ■ ¶9 The overriding question before us is whether the trial court erred in granting summary judgment to the

---

[2] Although the State did not file a petition for review, in its briefing it has presented essentially the same arguments as the County and has asked us to affirm the summary judgment entered by the superior court.

County and State. We review an order granting summary judgment de novo, "taking all facts and inferences in the light most favorable to the nonmoving party." *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 693, 169 P.3d 14 (2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "The moving party has the burden of showing that there is no genuine issue as to any material fact." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 70, 170 P.3d 10 (2007) (citing *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005)). This court has stated that "[w]hen a question is raised as to the existence of a natural watercourse, that question must be determined by the trier of fact." *Buxel v. King County*, 60 Wn.2d 404, 408, 374 P.2d 250 (1962) (citing *Tierney v. Yakima County*, 136 Wash. 481, 239 P. 248 (1925)). Similarly, Division One of the Court of Appeals has stated that the "nature or classification" of water as either water in a natural watercourse or surface water is to be determined by a trier of fact. *Snohomish County v. Postema*, 95 Wn. App. 817, 820, 978 P.2d 1101 (1998), *review denied*, 139 Wn.2d 1011, 994 P.2d 848 (1999).

██ ¶10 As we have noted above, the owners asserted several theories for recovery, but only one is before us and that is their claim of inverse condemnation. The Washington Constitution provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made." CONST. art. I, § 16. An inverse condemnation claim is "an action alleging a governmental 'taking' or 'damaging' that is brought to recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain." *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005) (citing *Phillips v. King County*, 136 Wn.2d 946, 957, 968 P.2d 871 (1998)). "The elements required to establish

inverse condemnation are: (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." *Id.* at 535.

## III

■ ■ ¶11 At the outset, we address the question of whether the County and State have statutory immunity from the owners' inverse condemnation claim pursuant to former RCW 86.12.037 (1921) and RCW 86.16.071. Under former RCW 86.12.037, counties have no liability for contractual or noncontractual acts "relating to the improvement, protection, regulation and control for flood prevention . . . purposes of any river or its tributaries." Likewise, under RCW 86.16.071, the "exercise by the state of the authority, duties, and responsibilities [relating to flood control] shall not imply or create any liability for any damages against the state." Statutory immunity does not, however, extend to claims for damages resulting from flood control measures when the cause of action is based on a constitutional taking claim. *See Halverson*, 139 Wn.2d at 12 (stating statutory immunity is inapplicable when the alleged violation is based solely on constitutional grounds); *Paulson v. County of Pierce*, 99 Wn.2d 645, 652, 664 P.2d 1202 (1983) (holding "RCW 86.12.037 does not affect fundamental rights" and therefore does not prohibit recovery for an inverse condemnation claim under article I, section 16 of the Washington Constitution). Because the owners' inverse condemnation claim is solely based on article I, section 16 of the Washington Constitution, the County and State are not entitled to statutory immunity.

## IV

¶12 The central issue before us is whether the common enemy rule bars the owners' inverse condemnation claim. Two common law doctrines have historically applied to water drainage issues in Washington: the common enemy

rule and the natural watercourse rule. The County and State each contend that the common enemy rule applies,[3] whereas the owners argue that the natural watercourse rule applies.

¶13 "[T]he common enemy doctrine . . . allows landowners to alter the flow of surface water to the detriment of their neighbors, so long as they do not block a watercourse or natural drainway." *Currens v. Sleek*, 138 Wn.2d 858, 862-63, 983 P.2d 626 (1999). "Surface water" is defined as that which is "caused by the falling of rain or the melting of snow," or water that escapes from running streams and rivers, and that which loses its identity and existence as a body of water. *Cass v. Dicks*, 14 Wash. 75, 78, 44 P. 113 (1896). "The chief characteristic of surface water is its inability to maintain its identity and existence as a body of water. It is thus distinguished from water flowing in its natural course . . . ." *Halverson*, 139 Wn.2d at 15. A natural watercourse, however, has long been defined to include the flood channel of a stream because the flood channel " 'is as much a natural part of [the stream] as is the ordinary channel.' " *Sund v. Keating*, 43 Wn.2d 36, 43, 259 P.2d 1113 (1953) (quoting 3 HENRY PHILIP FARNHAM, THE LAW OF WATERS AND WATER RIGHTS § 880, at 2562 (1904)).

¶14 Water that meets the definition of surface water "is regarded as an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others." *Cass*, 14 Wash. at 78. The common enemy rule, therefore, provides that "[i]f one in the lawful exercise of his right to control, manage or improve his own land, finds it necessary to protect it from surface water flowing from higher land, he may do so, and if damage thereby results to another, it is [damage without remedy]." *Id.*

---

[3] Alternatively, the County and State argue that the natural watercourse rule applies only when damage is caused to an upstream landowner. Although typically this has been the case, there is no persuasive support for the County and State's argument that the owners in the present case are necessarily precluded from invoking the natural watercourse rule merely because the property at issue is downstream from the Sloan-Witchert Slough Dike.

■ ¶15 In contrast, the natural watercourse rule prevents interference with the natural flow of a waterway. *Currens*, 138 Wn.2d at 862. This rule is based on the principle that watercourses "must be kept open to carry water into streams and lakes." *Id.* (citing 78 AM. JUR. 2D *Waters* § 134 (1975)). Under this rule, parties are not protected by the common enemy doctrine if they divert water from a natural watercourse and damage other properties. *See Sund*, 43 Wn.2d at 43 (citing 3 FARNHAM, *supra*, § 880, at 2562).

¶16 Here, the Court of Appeals relied on the *Sund* and *Halverson* cases to explain the distinction between a defendant who causes the natural course of a stream to move onto the plaintiff's property, damaging that property, and a defendant who causes a bottleneck in a river that leads to surface water backing up onto the plaintiff's property, damaging that property. *Fitzpatrick*, 143 Wn. App. at 295-99 (explaining *Sund*, 43 Wn.2d 36; *Halverson*, 139 Wn.2d 1). As the Court of Appeals observed, in *Halverson*, this court determined that the common enemy doctrine applies to diversion of surface water, whereas in *Sund*, we held that the common enemy doctrine does not apply to diversion of water that is part of a flood channel.

¶17 In *Halverson*, the record showed that levees were built on the north side of the river to deflect surface water back into the river; this deflection caused a backlog of surface water that spread out onto the plaintiffs' property on the south side of the river. The plaintiffs in that case argued that the water that damaged their property was not surface water because the surface water became natural water after being repelled by the levees. We explained, however, that surface water does not become natural water "simply because the water, *after being repelled by the levees*, returns to the defined river channel." *Halverson*, 139 Wn.2d at 16. We stated that "[a]s long as the river remains within its banks, it does not contact the dikes and, thus, *the levees have no influence on the river*." *Id.* at 18 (emphasis added). Because that case concerned a diversion of surface water,

we held that the common enemy doctrine was applicable and "provided a defense to the County's liability." *Id.* at 19.

¶18 The facts in *Sund* were quite different. The defendants there moved gravel from a natural ridge separating their property from the plaintiffs' property. That act caused the stream, which ran along the southern border of the subject properties, to change course and move onto the plaintiffs' property. In determining whether the common enemy doctrine shielded the defendants from liability, we considered the character of the water at issue, stating that "if the waters were in the flood channel of a stream, then certain principles become self-evident: (a) They are properly classified as riparian waters rather than surface waters; (b) being riparian waters, the rules relating to watercourses would apply." *Sund*, 43 Wn.2d at 44. We then stated that "[s]ince the cause of action is one based on diversion of a watercourse, the applicable body of law is that relating to watercourses and riparian rights—*not the law relative to surface waters.*" *Id.* at 40 (emphasis added). We concluded that because the water at issue was in a natural watercourse, the defendants were not entitled to assert the common enemy defense.

¶19 The outcome of this appeal, therefore, turns on whether the water that washed away the owners' property is classified as surface water or water within a natural watercourse. The distinction between surface water and water in a natural watercourse is important because, as noted above, if the water is surface water, then the common enemy doctrine applies, providing a defense to a plaintiff's claim. If, however, it is water in a natural watercourse, then the common enemy doctrine is inapplicable and does not shield the defendant from liability.[4]

---

[4] The dissent's disagreement with our conclusion is based, in part, on our statement that "[w]hile *Sund* narrows the concept of surface waters, it does not change the rule that landowners seeking to protect against surface waters can build levees without incurring liability for damages, even when those levees keep floodwaters *within* the confines of a stream." *Halverson*, 139 Wn.2d at 15-16. While we could, perhaps, have been clearer in *Halverson*, when what we said is taken in context, it does not, as the dissent suggests, gut the distinction between surface

¶20 The owners contend that the common enemy doctrine is inapplicable because the Sloan-Witchert Slough Dike, which was constructed by the County and improved with involvement by the State, blocked *natural watercourses* that would have reduced the river's flow during the 2002 high-water event and thereby prevented the damage to the owners' property. The owners argue that it is not *surface water* that caused the damage to their property, but rather water in a *natural watercourse*. That being the case, they contend that the common enemy doctrine is inapplicable.

¶21 As we observed above, the owners presented the trial court with a declaration from Dr. Bradley as support for their position. Dr. Bradley, who has a PhD in Civil Engineering—Hydraulics, stated that "there are several naturally defined side channels, or watercourses, in the right floodplain of the Methow River in the vicinity of the dike. These side channels relieve flow from the main channel as the water level rises during a high flow event." CP at 132-33. Dr. Bradley went on to state:

[I]t is clear that one by one the side channels in the right floodplain were blocked off with the construction of dikes beginning in 1975 through the 1999 Army Corps of Engineers flood fight[.] This action has confined flow to the main channel during high flows[.]

... By allowing the river to access the[ ] natural side channels, it would have been able to meander more naturally and the avulsion that occurred in 2002 would not have occurred[.]

---

water and water in a natural watercourse such that the common enemy doctrine is inapplicable when a landowner seeks to protect against floodwater by building a levee or dike. We say this because in *Halverson*, we painstakingly distinguished the facts there from those in *Sund* to reach the conclusion that the character of the floodwater at issue was surface water rather than water in a natural watercourse and, therefore, the common enemy doctrine shielded the defendant from liability. If this court had intended to erase the historical distinction between surface water and water in a natural watercourse in terms of the applicability of the common enemy doctrine, we would not have been so careful to distinguish the character of the water in *Halverson* as surface water from that characterized as water in a natural watercourse in *Sund*.

. . . The construction of the dikes limited the path the avulsion could take to the one that it took in 2002. All other side channels had been blocked by the dike and in June 2002, the river had only one path to take and that was across the large meander bend which resulted in the loss of the Fitzpatrick property.

*Id.* at 133. In addition, the trial court was presented with a map that Dr. Bradley prepared. It identified the natural side channels in the area of the dikes and supported his assertion that if the side channels had not been blocked by the dikes, during a high-water event the water would have flowed into the side channels, rather than being confined to the main channel. Confinement of the water to the main channel, the owners' contend, caused what Dr. Bradley called an "avulsion" and the resultant damage to the owners' property.

¶22 As noted above, the owners sought reconsideration of the trial court's summary judgment ruling. Appended to their motion for reconsideration was the aforementioned memorandum that had been prepared by Wald. In it, Wald discussed his observations of the County's work on the dike in 1999:

This road and dike work has impacted the Methow River by cutting off at least three natural overflow channels in the floodplain, thereby compressing more flood flow into the main channel and reducing the natural flood conveyance capacity of the river. Overall this work has cut off about a mile of overflow channels. Additional velocity and quantities of high flows compressed into the main channel during floods are disrupting the natural bed form of the river and causing additional erosion and scour of the main channel downstream. The new dike work is also impacting other high flow channels on the right bank by increasing flows into the next meander downstream. It appears from the aerial photo that it may also exacerbate problems with the river running closer to the toe of the county road (Mazama Road) on the left bank.

*Id.* at 254-55. Wald also stated that "the dike work is also leaking badly and could easily wash out during the next

high flows. If the dike work fails, the rock and sediment will be washed into the floodplain, adversely impacting water quality and plugging up the side channels on the right bank." *Id.* at 255. Wald's memorandum agreed with Dr. Bradley that the dikes blocked natural watercourses, and it supported the owners' theory that the property was damaged by water in a natural watercourse rather than surface water.

¶23 The County and State presented no evidence to refute the assertions of Dr. Bradley and Mr. Wald. The trial court nevertheless granted the County and State's motion for summary judgment. In doing so and in later denying the owners' motion for reconsideration of that ruling, the trial court appeared to disregard the evidence presented by the owners, relying exclusively on this court's holding in *Halverson* in which we observed that the common enemy rule barred a damage claim based on the construction of levees and dikes, which protected against encroachment of surface water. *Halverson*, 139 Wn.2d at 18-19.

¶24 Here, unlike in *Halverson*, the only evidence that was presented to the trial court supported the owners' argument that the water that washed away the subject property was water in the natural watercourse, not surface water. As we explained above, the owners' theory was that the road and dike work impacted the river by cutting off natural overflow channels in the floodplain, thereby forcing all of the flow during the high-water event into the main channel and onto the owners' property. The only counter to this by the County and State was that they are shielded from liability under the common enemy doctrine because the water at issue was surface water. However, the availability of that defense to the defendants turns on whether the water that washed away the owners' property was surface water or water in a natural watercourse. That is a factual question.

¶25 Under the summary judgment standard, which requires us to view the facts and the inferences from those facts in the light most favorable to the nonmoving party

(the owners), it is apparent that there is a factual issue about whether the water that caused damage to the owners' property was water that was diverted from the natural watercourse and, if so, whether liability for that damage flows from the County and State's construction of the dikes.

## V

¶26 The County and State assert, additionally, that the owners cannot bring their inverse condemnation claim because the damage complained of was not originally contemplated by the plan of work or a necessary incident to the governmental project. As noted above, the elements of an inverse condemnation are "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." *Dickgieser*, 153 Wn.2d at 535.

¶27 To support their position, the County and State rely on *Olson v. King County*, 71 Wn.2d 279, 284-85, 428 P.2d 562 (1967) ("The inundating of the properties of the plaintiffs with rocks, dirt, silt and debris . . . was neither *contemplated by the plan of the work*, nor was it a *necessary incident* in the building or maintenance of the road." (emphasis added)), and *Dickgieser*, 153 Wn.2d at 541 ("a taking occurs only if the [S]tate's interference with another's property is a 'necessary incident' to the public use of the State's land" (quoting *Olson*, 71 Wn.2d at 285)). The better standard is that which we applied in *Dickgieser*, which focuses on whether the damage to the owners' property was a necessary incident to the governmental project. *Id.* This is not one of the five elements of inverse condemnation, but rather an inquiry under the public use element of the inverse condemnation test.

¶28 Wald's opinion, as set forth in his memorandum, runs counter to the contention of the County and State that there is nothing in the record to suggest that flood damage to the owners' property was "a necessary incident" to the

dike work. As noted above, Wald's memorandum sets forth his concern about the dike work that was done in response to a high-water event in June 1999. Therein, Wald disputed the County's characterization of that event as an "emergency as a result of river flow in the high flow channels" and recommended that the "dike work be removed and replace[d] through the appropriate permit process." CP at 254, 255. In reaching this conclusion, Wald explained that the dike work "impacted the Methow River by cutting off at least three natural overflow channels in the floodplain, thereby compressing more flood flow into the main channel and reducing the natural flood conveyance capacity of the river." *Id.* at 254-55. Wald's memorandum appears to establish that the County and State were on notice three years prior to the high-water event that the Methow River may, as "a necessary incident to" or a consequence of the dike work, flood onto the owners' property due to the side channels' having been blocked by the work.

¶29 We believe that the record shows that there is a genuine issue of material fact as to whether the damage to the owners' property was a necessary incident to the County and State's work on the dike. Like the other factual question, this should be resolved by the trier of fact on remand.

## VI

¶30 In sum, we hold that the common enemy doctrine does not bar inverse condemnation claims for damage to property caused by water flowing through a natural watercourse. Because there are genuine issues of material fact as to whether the water that washed away the owners' property was water in a natural watercourse or surface water and whether the damage to the owners' property was a necessary incident to the County and State's work on the dike, the trial court erred in granting summary judgment.

The decision of the Court of Appeals is affirmed and the case is remanded to the trial court for further proceedings.

C. Johnson, Sanders, Chambers, Owens, Fairhurst, and Stephens, JJ., concur.

¶31 Madsen, C.J. (dissenting) — The majority makes a sweeping change in the law, with the unfortunate result that efforts to protect land from floodwaters will instead give rise to liability for such conduct. The majority's decision will serve as a major deterrence to government flood control measures. And because the principles upon which the inverse condemnation claim is based in this case are those of the common law, the majority alters the common law to the detriment of all landowners seeking to protect their property from flooding. The long standing law in this state has been that the common enemy doctrine allows property owners to construct dikes and levees to protect their property from floodwaters, including floodwaters that overflow the banks of rivers, which are natural watercourses. But under the majority opinion this application of the common enemy rule has been drastically altered and a landowner will incur liability for having constructed levies or dikes to protect from such floodwaters.

¶32 While purporting to be applying existing law, the majority wrongly identifies two common law doctrines as being at issue—the common enemy doctrine and the "natural watercourse rule." There is no "natural watercourse rule" in this state—the term is invented by the majority. Nor does the theory the majority calls the "natural watercourse rule" exist to nullify application of the long standing common enemy doctrine whenever waters escaping from a watercourse are at issue—whether in a "flood channel" or not.

¶33 The majority's new rule is derived from a single case that arose under vastly different circumstances and which involves a different principle altogether. The majority's

misapplication of law evidently occurs because the majority seeks to apply a theory relevant to the doctrine of riparian water rights to a fact pattern that does not involve riparian rights.

¶34 When the proper analysis is applied, it is apparent that summary judgment was correctly granted in favor of respondents Okanogan County (County) and the State of Washington.

¶35 The majority also concludes that questions of fact preclude summary judgment on the inverse condemnation claim brought by the landowners in this case, but never explains why it believes this to be true. To the contrary, the facts in this case lead to only one reasonable inference. An inverse condemnation claim is the flip side of a condemnation action—the only difference is that in the former case the government does not formally condemn the property, i.e., there is no formal exercise of the power of eminent domain. The Fitzpatricks[5] cannot establish the "public use" element of their inverse condemnation claim. The flooding of the Fitzpatricks' property was not reasonably necessary to construction and maintenance of the dike, and therefore as a matter of law the property was not taken for a public use and the Fitzpatricks should not be able to pursue a claim for inverse condemnation.

## ANALYSIS

¶36 As the majority recognizes, inverse condemnation liability in a case such as the present one is subject to "the peculiarities of private law rules governing interference with 'surface waters,' 'flood waters,' and 'stream waters.'" Arvo Van Alstyne, *Inverse Condemnation: Unintended Physical Damages*, 20 HASTINGS L.J. 431, 448-49 (1968). The law that should be applied in this case was recently stated by this court:

---

[5] Don Fitzpatrick, Pam Fitzpatrick, Brad Sturgill, and Heather Fitzpatrick Sturgill, "respondents" herein.

Under longstanding Washington law,

> [w]aters escaping from the banks of a river at times of flood are surface waters, and are waters which an owner of land may lawfully protect against by dikes and fills on his own property, even though the effect is to cause an increased flow of water on the lands of another to the damage of his lands.

*Halverson v. Skagit County*, 139 Wn.2d 1, 15, 983 P.2d 643 (1999) (quoting *Morton v. Hines*, 112 Wash. 612, 617, 192 P. 1016 (1920)). The governing principle is that surface water is "an outlaw and a common enemy against which anyone may defend himself, even though by doing so injury may result to others." *Cass v. Dicks*, 14 Wash. 75, 78, 44 P. 113 (1896). The injury to the other is injury without redress. *Id.*; *accord Halverson*, 139 Wn.2d at 16.

¶37 The rule in *Halverson* is a specialized form of the common enemy doctrine, which applies to structures and alterations to the land for the purpose of preventing flooding of the landowner's property. It is an offshoot of the rule in Washington that a landowner who alters the land resulting in a change in surface water flow is not liable for damage caused unless in the course of making improvements he or she "blocked a natural drain or waterway, collected and discharged water on [a] neighbor's land, or failed to exercise due care in preventing unnecessary damage." *Currens v. Sleek*, 138 Wn.2d 858, 867-68, 983 P.2d 626 (1999). In *Currens* the landowner improved her property by clear cutting and grading, which allegedly caused flooding on neighboring property. The case did not involve flood prevention.

¶38 Thus, prior to the majority's alteration of settled law, the common enemy doctrine in this state was long held to apply to waters escaping from the banks of a river at times of flood, which were deemed to be surface waters. Under this general rule, the water escaping from the Methow River was surface water subject to the common enemy doctrine and the respondent government entities had the right to build levees or dams to protect property from flooding without liability for doing so.

¶39 The Fitzpatricks say, however, that the usual rule does not apply in the context here. They contend that the common enemy doctrine does not apply when defending against "riparian waters" flowing within a natural stream or natural watercourse. They argue that, under *Sund v. Keating*, 43 Wn.2d 36, 43, 259 P.2d 1113 (1953), a watercourse includes the flood channel of a stream. Therefore, they argue, the classification of the water determines whether the common enemy doctrine will apply and a landowner cannot defend against "riparian water"—water in a natural watercourse including the flood channels—without liability.

¶40 The Fitzpatricks are correct insofar as they recognize that the common enemy doctrine applies to surface waters. Usually water in a watercourse does not come within the doctrine because it is not surface water (but, as explained, it counts as surface water if it is escaping flood water). But the Fitzpatricks' assertion that water in a watercourse or flood channel is *always* riparian water to which the common enemy doctrine has no application is absolutely wrong under Washington law. Unfortunately, the majority accepts this unfounded argument. The majority declines to follow the common enemy rule set out in *Halverson,* applying instead a rule it derives from *Sund,* i.e., that the flood channel of a stream is a natural part of the stream and no one can interfere with it. Majority at 608. In the majority's view, although the common enemy rule permits a landowner to protect against waters that escape over the banks of a stream and are no longer part of the watercourse, it does not permit a landowner to disturb the flood channel of a stream, which itself is a watercourse and is composed in part of channels that carry overflow from a stream.

¶41 But *Sund* arose in the context of a disagreement between riparian owners about a watercourse flowing through their adjacent properties. That is not the context here. By applying the analysis from *Sund* here, the majority effectively negates the common enemy rule as it applies to

the construction of levees and dikes to protect one's property from flooding and creates liability where it did not exist before. Unfortunately, the majority alters state law as a result of its failure to understand what riparian water rights are and why they made a difference in *Sund*.

¶42 I recognize that in *Halverson* the court attempted to harmonize *Sund* with the common enemy doctrine as it applies to improvements for the protection of land from waters overflowing a stream. Although the court in *Halverson* tried to accommodate the rule from *Sund*, treating it as a broadly applying principle, *Sund* in fact involved a very different set of circumstances. It did not involve a landowner building a dike or levee to protect his property or floodwaters overflowing the bank of a watercourse. Instead, in *Sund* a landowner, in the course of building a parking lot on his land, excavated and removed part of a stream bank with the result that the weakened bank gave way during a storm and water was diverted out of the main channel of the stream onto the adjoining landowner's property. The watercourse at issue was the stream and, as the court determined, the flood channel, which was defined by a ridge traversing the parties' lands. *Sund*, 43 Wn.2d at 44.

¶43 The court had to determine whether the common enemy doctrine as traditionally stated could be applied in a way that would permit impairment of a riparian right holder's right to the flow of water. Because the land of the two landowners in *Sund* abutted the watercourse that was diverted, the court utilized principles that apply when there is a dispute between landowners, each of which is a riparian owner with respect to a watercourse. The common law of riparian rights provides both that "[l]and use alterations which result in a substantial increase in the natural flow of a stream and cause flood damage are an interference with riparian rights" and "that a landowner may not divert the natural waters or obstruct the flow of a natural stream so that the diverted waters combined with flood waters cause damage to neighboring properties." A. Dan Tarlock, Law of Water Rights and Resources § 3:16, at 3-28, 3-30 (2010).

¶44 The court observed that in early cases the common enemy doctrine had been applied to water escaping from a watercourse but explained:

> In none of these cases have we decided whether flood waters, still remaining within the confines of the flood channel of a stream, are an integral part of the watercourse and *governed by the laws relating to riparian rights*, or whether they are surface waters. *If the law of riparian rights governs here*, then one of the rights of respondents, *as a riparian owner*, was to have the water of Clark Creek continue to flow in its *natural course*. As a corollary of this right, appellants, either intentionally or negligently, could not divert the course of the stream. II Farnham, Waters and Water Rights, 1634-1637, §§ 489-490. And, if appellants so negligently excavated near the bank of a stream that flood waters of the stream caused it to change its course, then appellants are liable.

*Sund*, 43 Wn.2d at 42 (emphasis added). The court went on to find that the law of riparian rights controlled based on its determination that the flood channel of a stream was part of the natural watercourse in which a riparian right holder had the right to the water undiminished and unobstructed in its natural flow. It concluded that "the case is governed by *principles of law relating to riparian rights*, and the action is one for negligent diversion of a watercourse." *Id.* at 41 (emphasis added). The majority misrepresents the court's holding in *Sund* as being merely that because the water at issue was in a natural watercourse, the common enemy rule did not apply. Majority at 609. This completely ignores the importance of riparian rights in *Sund*; preventing impairment to riparian rights was what *Sund* was all about.[6]

---

[6] The majority mischaracterizes the analysis it takes from *Sund* and applies here. For example, the majority paraphrases a sentence in *Sund*, stating that "parties are not protected by the common enemy doctrine if they divert water from a natural watercourse and damage other properties." Majority at 608 (citing *Sund*, 43 Wn.2d at 43). However, the majority has deleted a critical part of what was said in *Sund* and thereby completely alters what the court said there. The principle, in full, is that a landowner is not protected by the common enemy doctrine if he or she diverts water from a natural watercourse and thereby damages another's property, as " *'no one is permitted to interfere to the injury of other riparian*

¶45 The majority evidently misunderstands the nature of riparian rights and the source of the principles relied on in *Sund*. Riparian rights are a particular form of water rights. The leading American case on riparian principles is *Tyler v. Wilkinson*, 24 F. Cas. 472 (C.C.D.R.I. 1827) (No. 14,312). TARLOCK, *supra*, § 3:7. There, the court said with respect to "the . . . extent of the right, which riparian proprietors generally possess, to the waters of rivers flowing through their lands" that "[p]rima facie every proprietor upon each bank of a river is entitled to the land, covered with water, in front of his bank." *Tyler*, 24 F. Cas. at 473, 474. The riparian right holder, "[i]n virtue of this ownership[,] has a right to the use of the water flowing over it in its natural current, without diminution or obstruction." *Id.* at 474. "[N]o proprietor has the right to use the water to the prejudice of another [and] no one has the right to diminish the quantity which will, according to the natural current, flow to a proprietor below, or to throw it back upon a proprietor above." *Id.* This does not mean "that there can be no diminution whatsoever, and no obstruction or impediment whatsoever, by a riparian proprietor, in the use of water as it flows" but rather the use must be "reasonable use" and the test is "whether it is to the injury of the other proprietors or not." *Id.*

¶46 An important aspect of the riparian rights doctrine is that, even when the doctrine applies, riparian rights do not exist in all waters. Rather, "[t]o determine the waters to which riparian rights attach, waters are initially classified as either diffused surface waters or waters in a watercourse, either a stream or a lake." TARLOCK, *supra*, § 3:11. At common law, and historically, a landowner had a great deal more latitude with respect to diffused surface waters than watercourses. "To have water flow in stream as it customarily flowed was a riparian right, but landowners had a

owners.'" *Sund*, 43 Wn.2d at 43 (emphasis added) (quoting 3 HENRY PHILIP FARNHAM, THE LAW OF WATERS AND WATER RIGHTS § 880, at 2562 (1904)). The court was plainly stating the principle that applies under the doctrine of riparian water rights, but the majority turns it into an entirely different "rule"—one that conflicts with the common enemy doctrine as it exists in this state.

privilege to protect themselves from flooding." *Id.* § 3:12. The landowner could alter natural drainage patterns with respect to surface waters—and "[t]he initial common law rule was the common enemy rule." *Id.*

¶47 Thus, when riparian rights exist (or existed), the riparian rights were held in lakes and watercourses, but not in diffuse waters, including surface waters. But this is not the whole story of water rights, and this is where the majority goes astray.

¶48 In this state, between 1889 and 1917 two different doctrines governed water rights, the riparian rights doctrine and the prior appropriation doctrine. *Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 134, 18 P.3d 540 (2001); *In re Surface Waters of Deadman Creek Drainage Basin*, 103 Wn.2d 686, 694 P.2d 1071 (1985); 23 TIMOTHY BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 8.2, at 288-89 (2d ed. 2007). Under the prior appropriation doctrine, a water right is established only by putting water to beneficial use, and the first in time to appropriate has priority over later rights. 23 BUTLER & KING, *supra*, § 8.10, at 292. *See generally* TARLOCK, *supra*, ch. 5; 2 WATERS AND WATER RIGHTS ch. 12 (Robert E. Beck & Amy K. Kelley eds., 1991 ed. repl. vol. 2008). In 1917, with the enactment of the state surface water code (as distinguished from later laws regarding rights to withdraw groundwater),[7] the legislature decided that the *sole* doctrine applying to acquisition of water rights in Washington State would be the prior appropriation doctrine. *Hallauer*, 143 Wn.2d at 134; *see* LAWS OF 1917, ch. 117. Existing riparian rights were preserved, *see* RCW 90.03.010; however, as this court later determined, any riparian right that remained unused as of 1932 was forfeited, *Deadman Creek*, 103 Wn.2d at 695. No new riparian rights were obtained after the 1917 code took effect.

---

[7] "Surface water," as used in this sense, is not the same as "surface water" as the term is used in the context of deciding whether riparian water rights exist in the water.

¶49 Among a number of differences in the two kinds of water rights is that unlike a riparian owner's water right, prior appropriators obtain their water rights without regard to whether they possess land adjacent to a stream or lake. 23 BUTLER & KING, *supra*, § 8.10, at 292; *see* ch. 90.03 RCW. In addition, another difference, which a leading treatise calls the most significant difference, is that "water could be diverted from the stream and consumed on the premises or at least not returned to the source. The water did not have to flow on by." 2 WATERS AND WATER RIGHTS, *supra*, § 12.02(c)(1), at 12-12 to -13.

¶50 These principles are critical to understanding *Sund* and its current significance, if any. As mentioned, in *Sund*, 43 Wn.2d at 42, the court stated that "[i]f the law of riparian rights governs here, then one of the rights of respondents, *as a riparian owner*, was to have the water of Clark Creek *continue to flow in its natural course*." As explained above, this was a key aspect of a riparian water right holder's rights, which, as also explained, arose because of ownership of land abutting a stream (or lake). As a "corollary of th[e] right" to have water continue to flow in its natural course, the court explained in *Sund*, the "appellants, either intentionally or negligently, could not divert the course of the stream." *Id.*

¶51 But the right to have the water continue to flow in its natural course and the prohibition against diverting the watercourse existed because the landowners in *Sund* were riparian water right holders with respect to the stream that flowed through their lands.[8] As also explained, a landowner with riparian rights in a stream did not have riparian rights in diffuse or surface waters. This is why the court began its statement of the issue with "[i]f the law of riparian rights governs here." *Id.* The court had

---

[8] When *Sund* was decided, no determination had yet been made that riparian rights were forfeited if unused by 1932. *Sund* was decided in 1953. *Deadman Creek* was decided in 1985, more than 30 years later.

Given the way in which the court analyzed the case, and its reference to a treatise stating the law of riparian rights, it is obvious that the case was decided on the basis that the landowners in the dispute held riparian water rights.

to determine if the respondent in *Sund* had riparian rights at issue, and to do this the court had to decide whether the waters at issue were those of a watercourse—to which riparian rights attached, or were diffuse surface waters—to which riparian rights did not attach and which would be governed by the common enemy doctrine. This is why the distinction between these two types of water was so important in *Sund*.

¶52 The court decided that waters within the flood channel of a stream are part of the watercourse. With this holding, the court determined that riparian rights were at issue and the law respecting riparian rights applied. The whole import of *Sund* is that the court recognized that the common enemy doctrine could not be applied in cases to escape liability if rights of a riparian water right holder were impaired. Water rights are valuable property rights, and the common enemy doctrine, if applied, could mean that these valuable rights could be impaired without any liability on the part of the actor. But *Sund* does not address what happens when landowners do not have riparian rights. And because prior appropriation has been the only way in which new water rights could be acquired in this state since 1917, it cannot be assumed that a landowner has riparian water rights, even if his or her land abuts a body of water. Most water rights in this state are not riparian water rights.

¶53 Here, the majority, like the landowners, equates water in a watercourse with "riparian waters" and applies the rule of *Sund*. As explained above, "riparian waters" as used in *Sund* means water in which riparian rights are held; the term is not an equivalent substitute for "water in a watercourse." In any event, the landowners do not claim they are the holders of riparian water rights.

¶54 *Sund* also does not address the common enemy doctrine as it has continued to exist in this state quite apart from riparian water rights questions. As explained, the controlling rule is that surface water is "an outlaw and a common enemy against which anyone may defend himself,

even though by doing so injury may result to others." *Cass*, 14 Wash. at 78; *Currens*, 138 Wn.2d at 861; *Halverson*, 139 Wn.2d at 16. The common enemy doctrine, as it has existed in this state, has its own qualifications. As mentioned, the common enemy doctrine does not permit one to block a natural drain or waterway, collect and discharge water on a neighbor's land, or fail to exercise due care in preventing unnecessary damage. *Currens*, 138 Wn.2d at 867-68.

¶55 The majority cites *Currens* for the proposition that the common enemy rule does not serve as a defense when a landowner diverts water from a natural watercourse. Majority at 608. But this is a different proposition from that stated in *Sund*, which held that the *rights of a riparian water rights holder* cannot be impaired by alteration of a natural watercourse's *flood channel.* The majority blurs two distinct concepts and creates an entirely new principle— that blocking a flood channel is never permitted without liability. Neither *Currens* nor *Sund* stands for this proposition, and it is entirely inconsistent with the purpose of the common enemy doctrine, which expressly permits a landowner to build dams and levees in order to protect against flooding.

¶56 In short, *Sund* does not apply in this case. The majority is wrong to apply the rule from *Sund* in this case without regard to whether riparian rights exist in this case. The principles regarding interference with a watercourse that applied in *Sund* applied because of the nature of the riparian water rights held by the adjacent landowners. In a given case it is much more likely that any water rights that are held have been obtained through prior appropriation.

¶57 And, very significantly, when this state's legislature decided that all water rights obtained after 1917 had to be appropriative rights obtained by permit—no more riparian water rights—it was expressing a policy decision that citizens of this state would not in the future be entitled to obtain the kind of interests in water protected in *Sund*. (Some very old riparian rights probably still exist but, as noted, the Fitzpatricks do not claim they hold such a right.)

This does not mean a landowner can do anything he or she wants with respect to watercourses—but there is no superior interest in a watercourse that means that the common enemy doctrine as traditionally stated and developed cannot be applied to waters posing a flooding threat when escaping from a watercourse.

¶58 In addition, the way in which the majority applies *Sund* here defies logic. Whenever any land is flooded by overflow from a stream, the floodwaters will flow into and through any depressions or swales on the land. Under the majority's theory, these lower-lying areas constitute watercourses (the flood channel) that the landowner cannot, without incurring liability, block by placement of dikes, levees, or similar improvements to protect from floodwaters. But because flooding seldom occurs on flat land, there will virtually always be a "channel" or "channels" that carry the floodwaters onto the land, and this is where flood prevention measures must be implemented. Because of the majority's analysis, however, effectively, a landowner cannot protect him- or herself from flooding.

¶59 The result is also at odds with the common enemy rule we reiterated in *Halverson*, the very purpose of which is to allow a landowner to prevent damage to his or her property from floodwaters. *Halverson*, 139 Wn.2d at 16. We expressly noted in *Halverson* that although *Sund* narrowed the concept of surface waters, it did not affect the rule that "landowners seeking to protect against surface waters can build levees without incurring liability for damages" even if the result is to keep floodwaters within a watercourse. *Id.* at 15-16.

¶60 Finally, in the present case, the Fitzpatricks' land does not abut the alleged flood channels that they contend were interfered with by construction of the dike. Even if they have any riparian rights at all, they would have none in these channels as a result of their land ownership, and therefore would have no riparian rights affected by the watercourse obstruction that they contend occurred.

¶61 In sum, the majority is flawed because it gives effect to a newly minted doctrine, the "natural watercourse rule," that conflicts with the common enemy rule, when the only context in which that should be true under our case law is the context of riparian rights and there only because of the nature of a riparian water right. The common enemy rule is, as always has been confirmed in our cases, a rule pertaining to surface waters. Water that escapes from a watercourse has always been treated as surface water for purposes of the common enemy doctrine except, under *Sund*, where doing so in the case of flood channels would violate a riparian water rights holder's right to undiminished, unobstructed flow of the water through the watercourse on which his or her land abuts.

¶62 I would hold that the common enemy doctrine permits a landowner to build dikes and levees to protect his or her land from surface waters that escape in times of flood,[9] and confine *Sund* to the context in which it arose. In this case, prior to construction of the dike, the Methow River had a history of flooding that caused damage to adjacent property, irrigation canals, and Highway 20. There was concern that the river would change channels and threaten the highway and a downstream bridge. The respondents lawfully constructed the dike to protect against such flooding.

¶63 Next, the majority concludes that summary judgment was improper on the ground that whether the Fitzpatricks have established the elements of an inverse condemnation claim requires the trier of fact to resolve factual questions. But as a matter of law, this issue should be resolved in favor of the respondents.

¶64 Initially, whether state or county actions caused damage to the Fitzpatricks' property and whether either government entity was negligent do not determine whether

---

[9] Obviously, protecting against floodwaters escaping from a river means that to be effective, the prevention must occur before the water escapes—the common enemy doctrine is not a rule for placing sand bags after the flooding begins. The very purpose of the rule is to permit landowners to prevent flood damage.

a constitutional taking or damaging of property occurred. "[G]overnmental torts do not become takings simply because the alleged tortfeasor is the government." *Dickgieser v. State*, 153 Wn.2d 530, 541, 105 P.3d 26 (2005); *Eggleston v. Pierce County*, 148 Wn.2d 760, 768, 64 P.3d 618 (2003) ("clearly, not every government action that takes, damages, or destroys property is a taking"); *Olson v. King County*, 71 Wn.2d 279, 284, 428 P.2d 562 (1967) ("[e]very trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tort feasor is the state or one of its subdivisions, such as a county or a city"). Put quite simply, damage does not equal a takings.

¶65 The State and the County argue that the Fitzpatricks are unable to establish the "public use" element of their inverse condemnation claim. The property devoted to a public use is the property on which the dike is located, and the inverse condemnation claim rests on the premise that the maintenance and use of this property has allegedly damaged the Fitzpatricks' property, which itself was not devoted to a public use. In deciding whether the "public use" element of a takings claim is satisfied in such circumstances, the inquiry is into whether the damage to the plaintiff's property was a necessary incident of the government's dedication of its property to a public use. *Dickgieser*, 153 Wn.2d at 538.

¶66 The State and the County rely on *Olson*, where landowners brought several claims against King County to recover for damage to their properties due to the washout of a highway embankment following heavy rains, including a taking and violation of property in violation of article I, section 16, of the Washington State Constitution. The court concluded that no takings occurred because the fill above the plaintiffs' properties occasioned no damage for 27 years and the damage was "neither contemplated by the plan of

the work, nor was it a necessary incident in the building or maintenance of the road." *Olson*, 71 Wn.2d at 285.[10]

¶67 The Fitzpatricks contend, however, that *Olson* is incorrect insofar as it suggests that it is relevant to ask, under article I, section 16, whether the damage is contemplated by the plan of work. The majority appears to agree, offering no explanation for its conclusion. However, because there is no evidence that the damage to the Fitzpatricks' property was contemplated by the plan of the work for constructing or operating the dike, it is unnecessary to consider the question in this case. Rather, the dispositive question here is whether the Fitzpatricks can establish that the damage to their property was a necessary incident of construction or maintenance of the dike.

¶68 For more than 26 years the dike existed and the Methow River continued to flow in the same channel without damage to the Fitzpatricks' property. This is similar to the length of time in *Olson* that no damage ensued from the county's construction of the highway embankment. As a matter of law, the flooding of the Fitzpatricks' property was not reasonably necessary to construction and maintenance of the dike, particularly where the flooding occurred following a high water event, breakup of a major log jam, and a river avulsion more than 26 years after the dike was originally constructed.

¶69 "No private property shall be taken or damaged . . . without just compensation having first been made." CONST. art. I, § 16. " '[I]nverse condemnation' is used to describe an

---

[10] In reaching its conclusion, the court in *Olson* expressly relied on the analysis from *Boitano v. Snohomish County*, 11 Wn.2d 664, 668, 120 P.2d 490 (1941). There, Snohomish County operated a gravel pit for road construction, "undoubtedly a public use," *id.*, and uncovered a large spring. In order to rid the gravel pit of the water from the spring, the county constructed a channel for it, depositing it on the plaintiffs' property, which led to flooding of the property. *Id.* at 671. The court said that "[t]he construction of the channel and the disposition of the water constituted, in our opinion, a necessary part of the county's operation of its gravel pit, for the inference is irresistible that the water would otherwise have accumulated there and thus would have interfered with the operation of the pit." *Id.* The court concluded that the county was devoting the plaintiffs' property "to a public use incidental to its operation of the gravel pit." *Id.*

action alleging a governmental 'taking,' brought to recover the value of the property which has been appropriated in fact, but with no formal exercise of the power of eminent domain." *Phillips v. King County*, 136 Wn.2d 946, 957, 968 P.2d 871 (1998); *see also Martin v. Port of Seattle*, 64 Wn.2d 309, 310 n.1, 391 P.2d 540 (1964). Under article I, section 16, when an inverse condemnation claim is asserted the plaintiff must prove a taking or damaging of property. *Pierce v. Ne. Lake Wash. Sewer & Water Dist.*, 123 Wn.2d 550, 556, 870 P.2d 305 (1994). "[I]nverse condemnation 'differs from eminent domain only in that the landowner institutes the action, rather than the entity possessing the condemnation power.'" *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 9, 548 P.2d 1085 (1976) (quoting *Martin*, 64 Wn.2d at 318).[11] Accordingly, an inverse condemnation action is appropriate only where the entity allegedly taking or damaging the property actually had the authority to condemn but did not in fact exercise the authority and condemn the property. *Cf. id.* at 17-18 (noting that a plaintiff may still have a tort remedy available if the "plaintiff seeks to recover damages . . . where the defendant is not an entity to which eminent domain principles apply").

¶70 This means that if the government entity could not have condemned the property at issue for a public purpose, then a takings claim cannot exist in this case, as a matter of law, because the public purpose element of an inverse condemnation claim cannot be proved.

¶71 Both the State and the County have the power of eminent domain. But it is a certainty that if the State or the County attempted to condemn the Fitzpatricks' land, a half-mile downstream, as being reasonably necessary to its construction, improvements, and operation of the dike, i.e., as being necessarily incident to maintenance and operation of the dike, this court would not permit such an exercise of

---

[11] Of course, this principle applies where, as here, a physical taking is alleged. There is no issue in this case whether a regulation or regulatory scheme has effected an unconstitutional taking.

the power of eminent domain. As a matter of law, therefore, the Fitzpatricks' inverse condemnation claim fails and the court should not hold that an inverse condemnation claim is a viable claim under the circumstances of this case.

¶72 The Fitzpatricks maintain, however, that unintended consequences of government action may constitute a taking. The Court of Appeals agreed, seeming to equate unintended consequences with damages that were not contemplated or necessarily incident to the construction of the dike. *Fitzpatrick v. Okanogan County*, 143 Wn. App. 288, 301, 177 P.3d 716, *review granted*, 164 Wn.2d 1008, 195 P.3d 86 (2008).

¶73 It is true that damage to property does not have to be anticipated for a takings to occur. But the issue is not whether the government *intended* to damage the Fitzpatricks' property, and neither the State nor the County has argued this point. Rather, the issue is that in order to establish the "public use" element—that its property was taken for a public use—the Fitzpatricks would have to show more than that their property was damaged because of the dike's construction, improvements, and operation. They are unable to show either that the damage to their property was contemplated by the plan of work (to the extent *Olson*'s reference to this inquiry may still hold validity) or that the damage was a necessary incident to the construction or operation of the dike. Both the Fitzpatricks' argument and the Court of Appeals' discussion of intended versus unintended consequences miss the mark.

¶74 In the end, the majority opinion sets up an impossible situation for the State and local governments. If it cannot be established that the damage to private property is reasonably necessary to the construction, improvement, or repair of a dike or similar flood prevention project, then the public use element has not been satisfied. On the facts here, the damage to the Fitzpatricks' property cannot be shown to be necessarily incident to maintenance or use of the dike. By refusing to uphold summary judgment on the inverse condemnation claim, the majority essentially says

that it is possible that the State or the County could be subject to liability for inverse condemnation damages under article I, section 16 when it could not have condemned the property in the first place. The government should not bear the responsibility of damages resulting from flood control measures without regard to the elements of a takings claim and RCW 86.12.037 and RCW 86.16.071, which provide statutory immunity to counties and the State from tort claims arising from flood prevention measures. Surely that is not a result contemplated by the legislature when it sought to encourage flood prevention measures through enactment of these statutes.

¶75 Finally, on this issue, the majority says that a hydrogeologist's memorandum shows that there is a question of fact whether the damage to the Fitzpatricks' property was a necessary incident to the dike. Majority at 613-14. The majority explains that the memorandum shows that the County and State were on notice that the Methow might flood onto the property as a " 'necessary incident to' or a consequence of the dike work." *Id.* at 614. This conclusion demonstrates a misconception about the public use element of an inverse condemnation claim and whether the damage to the plaintiff's property was a necessary incident of the government's dedication of its property to a public use.

¶76 The issue is not whether the damage might result from the public use to which other property is put, or whether the government was on notice that damage might occur, but whether, in order for the other property to be devoted to the intended public use as a dike to prevent flooding, damaging the plaintiffs' property was reasonably necessary. Could the dike have been constructed without necessarily damaging the property?

¶77 The majority has confused causation and resulting damage with the public use element of an inverse condemnation claim. As noted above, the fact that government action has caused the damage, or the fact that the damage resulted, or possible negligence on the government's part

does not establish that a taking has occurred. The hydrogeologist's memorandum might be relevant to a negligence action, if one could be brought, but it does not establish an issue of fact with respect to an inverse condemnation claim.

## CONCLUSION

¶78 The trial court properly granted summary judgment on the basis that under the common enemy doctrine the State and County were authorized to construct the dike to protect property from Methow River flooding. Unfortunately, the majority applies a theory from a case, *Sund*, that does not fit the facts of this case with the result that the common enemy doctrine no longer applies to permit landowners to construct dikes and levees to protect their property from such flooding. Summary judgment is also appropriate on the ground that as a matter of law the Fitzpatricks cannot establish the "public use" element of their inverse condemnation claim.

¶79 I would affirm the grant of summary judgment in favor of respondents State and Okanogan County. Accordingly, I dissent.

J.M. JOHNSON, J., concurs with MADSEN, C.J.